## HOUGHTON v. UNITED STATES.

Circuit Court of Appeals, Fourth Circuit. January 10, 1928.

No. 2662.

1. **Master and servant ⬀62—Invention conceived and perfected by employee while discharging duties is property of employee.**

Where an employee, while discharging duties assigned to him in his department of service, conceives and perfects an invention, such invention is property of employee.

2. **Master and servant ⬀62—Invention resulting from improvement by employee of method or instrument for doing work belongs to employee, subject to irrevocable license in employer.**

Where employee, while employed in certain line of work, has devised an improved method or instrument for doing such work, using property of employer and services of other employees, and has assented to employer's use of same, invention is property of employee, subject to irrevocable license on part of employer to use it.

3. **Master and servant ⬀62—Invention of fumigant for vessels by employee of Public Health Service held property of United States.**

Where one was employed as research chemist in Public Health Service to conduct experiments for purpose of combining a warning or irritant gas with hydrocyanic acid gas, theretofore used in fumigating vessels, so as to produce gas which could be readily detected and safely used as fumigant, *held*, that invention of such employee, by combining such hydrocyanic acid gas and cyanogen chloride gas, was the property of the United States.

4. **Master and servant ⬀62—Employer's right to invention of employee is based on nature of service in which employee is engaged.**

The right of an employer to invention of employee, depends, not on the terms of an original contract hiring him, but on the nature of service in which employee is engaged at time he makes invention, and arises out of duty which employee owes to employer with respect to service in which he is engaged.

5. **Master and servant ⬀62—Employee, set to experimenting with view of making inventions, must disclose discoveries to employer, and results of efforts belong to employer.**

If an employee is set to experimenting with view of making an invention, and accepts pay for such work, he must disclose to employer his discoveries in making experiments, and what he accomplishes by experiments belongs to employer.

**6. Master and servant ⬤⬤62—That United States does not desire monopoly in invention is no ground for denying its right to invention of government employee.**

Where government employee was assigned to conduct experiments for producing safe fumigant for vessels, right of United States to employee's invention cannot be denied on ground that rule that inventions made by one employed to invent belong to employer will not be applied, because the government does not desire a monopoly.

**7. Master and servant ⬤⬤62—Approval of government employee's application for patent did not deprive United States of ownership of invention.**

Where government employee, assigned to the particular task of inventing a safe fumigant for vessels, made such invention, United States acquired ownership of such invention, regardless of approval of government officers of employee's preparation of application for patent, since no subsequent recognition of right in employee, or even a conveyance to him, would confer any right on him, or bind government.

Appeal from the District Court of the United States for the District of Maryland, at Baltimore; Morris A. Soper, Judge.

Suit by the United States against Harry W. Houghton. Decree for the United States (20 F.[2d] 434), and defendant appeals. Affirmed.

Joseph William Hazell, of Washington, D. C. (Francis B. Leech, of Washington, D. C., on the brief), for appellant.

Henry C. Workman, of Washington, D. C. (F. Gwynn Gardiner, of Washington, D. C., H. J. Galloway, Asst. Atty. Gen., and A. W. W. Woodcock, U. S. Atty., of Baltimore, Md., on the brief), for the United States.

Before WADDILL, PARKER, and NORTHCOTT, Circuit Judges.

PARKER, Circuit Judge. This is an appeal from a decision that the United States is the equitable owner and entitled to the assignment of a patent issued to the defendant Houghton, who, when he made the invention which is the subject thereof, was an employee of the Public Health Service in the Treasury Department. The facts are fully stated in the opinion of the court below. U. S. v. Houghton (D. C.) 20 F.(2d) 434. Those necessary to an understanding of the questions involved in this appeal can be stated very briefly.

Houghton was a trained chemist holding a degree from a university. He was appointed assistant chemist in the office of Industrial Hygiene and Sanitation in the Public Health Service in June, 1920, at a salary of $2,-500 per year, which in December of that year was increased to $3,000. Prior to his being designated to make the experiments hereinafter described, his duties consisted chiefly in analyzing samples of dust from industrial plants.

The patent granted Houghton covers a fumigant gas produced by a combination of hydrocyanic acid gas with cyanogen chloride gas. Hydrocyanic acid gas had been used as a fumigant in disinfecting vessels in the ports of the United States for a number of years prior to the granting of the patent. Its use for this purpose, however, was fraught with considerable danger, on account of the fact that its presence could not readily be detected, and a very small amount of it would cause death. After Dr. Hugh S. Cumming was appointed Surgeon General of the Public Health Service in 1920, and at his direction, experiments were conducted for the purpose of combining a warning or irritant gas with this hydrocyanic acid gas, so as to produce a gas which could be readily detected and thus safely used as a fumigant.

About the 1st of March, 1922, a board composed of three members of the Public Health Service was appointed to conduct investigations for the purpose of developing such a fumigant gas, and Houghton was named as a member of the board. He was familiar with the results of the experiments and investigations which had previously been conducted by or at the request of the Health Service, had made a study of the literature on the subject at the direction of his superior in the service, and at the time of his appointment clearly understood that it was the special duty of the board to develop a fumigant or method of fumigation which would achieve the end desired. He also understood at that time that cyanogen chloride was one of the derivatives of cyanogen, which it was the duty of the board to investigate and consider in its attempt to solve the problem committed to it.

Shortly after Houghton's appointment to the board, he was sent to the Edgewood Arsenal Laboratory to conduct experiments in the production of the gas, in collaboration with three employees of the Chemical Warfare Service. These experiments were conducted, not only at the direction of the officials of the Public Health Service, but in accordance with their advice and along the general lines indicated by previous study and investigation. Houghton made reports during the progress of the experiments to his immediate superior, Dr. Thompson, who was

in charge of the office of Industrial Hygiene and Sanitation, and continuously received orders from him for further experiments and investigations, the laboratory details of which were left to his judgment and that of the chemists of the Chemical Warfare Service who were co-operating with him. The experiments resulted in the production of the desired gas, which was a mixture of hydrocyanic acid gas and cyanogen chloride, through a proper combination of sodium chlorate, sodium cyanide, and dilute hydrochloric acid. The method adopted for generating the gas was suggested by Houghton, but the success of the method was due in part to suggestions contributed by the chemists of the Chemical Warfare Service, who were at work with him on the problem.

Prior to the development of the desired gas, nothing was said as to securing a patent, and the patenting of the gas or of the method of producing it seems not to have been considered. After the experiments had proved successful, however, this matter was discussed, and Houghton agreed with his three associates of the Chemical Warfare Service that a patent should be obtained, in which each should have a one-fourth interest, subject to a nonexclusive license on the part of the government, and this agreement seems to have received the approval of his superior in the office of Industrial Hygiene and Sanitation. He accordingly made arrangements for filing an application for a patent through a patent attorney attached to the War Department; but before the application was filed he asked permission of the Surgeon General to apply for the patent, and the Surgeon General requested the opinion of the Solicitor of the Treasury Department with regard to the matter. The opinion of the Solicitor of the Treasury was that the invention belonged to the government; but, before it was received, Houghton had proceeded to file the application, filing at the same time an assignment to the Secretary of the Treasury and his successors in office, granting to them a nonexclusive license to make, use, and sell the gas which was the subject of the patent application. The Surgeon General protested the granting of the patent, and the first application was finally abandoned. Subsequently Houghton secured private patent attorneys and filed a new application, on which a patent was granted him over the protest of the Surgeon General. Before the filing of the original application, the three chemists who had collaborated with Houghton signed an instrument dedicating to the public their interest in the invention. A little over a year later, and while the original application was pending, Houghton consented to assign to the government, in trust for the public, his interest in the patent to be issued, but later withdrew the consent.

[1-3] It is clear, we think, upon these facts, that the case presented is not the ordinary case of an invention made by an employee, who, while discharging the duties assigned to him in his department of service, conceives and perfects an invention. In such case the rule is that the invention is the property of the employee. Hapgood v. Hewitt, 119 U. S. 226, 7 S. Ct. 193, 30 L. Ed. 369; Solomons v. U. S., 137 U. S. 342, 346, 11 S. Ct. 88, 34 L. Ed. 667; Dalzell v. Dueber Mfg. Co., 149 U. S. 315, 13 S. Ct. 886, 37 L. Ed. 749. Nor is it a case where the only claim of the employer arises out of the fact that the employee, while employed in a certain line of work, has devised and improved a method or instrument for doing that work, using the property of his employer and the services of other employees to develop his invention, and has assented to the employer's use of same. In such case the rule applies which Houghton seeks to invoke, viz. that the invention is the property of the employee, subject to an irrevocable license on the part of the employer to use it. McClurg v. Kingsland, 1 How. 202, 11 L. Ed. 102; Solomons v. U. S., supra; Lane & Bodley Co. v. Locke, 150 U. S. 193, 14 S. Ct. 78, 37 L. Ed. 1049; Gill v. U. S., 160 U. S. 426, 16 S. Ct. 322, 40 L. Ed. 480.

But the case here presented is that of an employee who makes a discovery or invention while employed to conduct experiments for the purpose of making it. Houghton did not conceive the idea of combining an irritant gas with hydrocyanic acid gas, so as to produce a safe fumigant. That was the idea of Dr. Cumming, the Surgeon General, under whom he was working. He did not conceive the idea of using cyanogen chloride gas as the irritant with the deadly gas. That idea had been advanced in a German periodical, and experiments and studies along that line had previously been conducted at the direction of the Health Service. All that he did was to take the idea of the Surgeon General, upon which the Health Service had been experimenting, and conduct experiments under its direction, for the purpose of determining how best to produce and combine the gases so as to achieve the result which the Surgeon General had in mind. For this he was relieved of other work and sent to the Edgewood Arsenal to make the experiments. His regular salary was paid to him while he was thus engaged, and, when he deduced from the

experiments the method to be followed in producing and combining the gases, he did merely that which he was being paid his salary to do. Under such circumstances, we think there can be no doubt that his invention is the property of his employer, the United States. U. S. v. Solomons, supra; Gill v. U. S., supra, 160 U. S. 426, 435, 436, 16 S. Ct. 322, 40 L. Ed. 480; Standard Parts Co. v. Peck, 264 U. S. 52, 44 S. Ct. 239, 68 L. Ed. 560, 32 A. L. R. 1033.

The rule applicable in such cases cannot be better stated than it was by Mr. Justice Brewer in the Solomons Case, supra, where he said (at page 346 [11 S. Ct. 89]):

"An employé, performing all the duties assigned to him in his department of service, may exercise his inventive faculties in any direction he chooses, with the assurance that whatever invention he may thus conceive and perfect is his individual property. There is no difference between the government and any other employer in this respect. But this general rule is subject to these limitations. If one is employed to devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer. That which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer. Whatever rights as an individual he may have had in and to his inventive powers, and that which they are able to accomplish, he has sold in advance to his employer."

It is true, as argued by defendant, that in the Solomons Case claim was made against the government for use of the device covered by the patent, and it was held that the patentee was estopped to claim compensation from the government under the authority of McClurg v. Kingsland, supra; but in the later case of Gill v. U. S., supra, Mr. Justice Brown cites with approval the reasoning of the Solomons Case, which we have quoted, and says that the case might have been decided on that proposition alone, saying:

"There is no doubt whatever of the proposition, laid down in Solomons Case, that the mere fact that a person is in the employ of the government does not preclude him from making improvements in the machines with which he is connected, and obtaining patents therefor, as his individual property, and that in such case the government would have no more right to seize upon and appropriate such property, than any other proprietor would have. On the other hand, it is equally clear that, if the patentee be employed to invent or devise such improvements his patents obtained therefor belong to his employer, since in making such improvements he is merely doing what he was hired to do. Indeed, the Solomons Case might have been decided wholly upon that ground, irrespective of the question of estoppel, since the finding was that Clark had been assigned the duty of devising a stamp, and it was understood by everybody that the scheme would proceed upon the assumption that the best stamp which he could devise would be adopted and made a part of the revised scheme. In these consultations it was understood that he was acting in his official capacity as Chief of the Bureau of Engraving and Printing, but it was not understood or intimated that the stamp he was to devise would be patented or become his personal property. In fact, he was employed and paid to do the very thing which he did, viz. to devise an improved stamp; and, having been employed for that purpose, the fruits of his inventive skill belonged as much to his employer as would the fruits of his mechanical skill." (Italics ours.)

In the recent case of Standard Parts Co. v. Peck, supra, the Supreme Court held that where an employee agreed to devote his time to the development of a process and machinery, his invention belonged to his employer, and reversed a holding by the Circuit Court of Appeals that such contract did not of its own force convey to the employer the equitable title to the patentable inventions, but gave him a license only. It cited with approval both the Solomons Case and the Gill Case as sustaining the proposition decided, and apropos of the contention (also made here) that the expressions in those cases as to the equitable ownership of the patents by the employer were mere dicta said:

"It is going very far to say that the declaration of Solomons v. United States, repeated in subsequent cases, and apparently constituting their grounds of decision, may be put aside or underrated—assigned the inconsequence of dicta. It might be said that there is persuasion in the repetition."

The court further said (and this seems to us decisive of the question involved in the case at bar):

"It cannot be contended that the invention of a specific thing cannot be made the subject of a bargain and pass in execution of it. And such, we think, was the object and effect of Peck's contract with the Hess-Pontiac Spring & Axle Company. That company had a want in its business—a 'problem'

is Peck's word—and he testified that 'Mr. Hess thought probably' that he (Peck) 'could be of some assistance to him (Hess) in working out' the 'problem,' and the 'thought' was natural. Hess had previous acquaintance with Peck—his inventive and other ability—and approached him, the result being the contract of August 23, 1915. * * * By the contract Peck engaged to 'devote his time to the development of a process and machinery' and was to receive therefor a stated compensation. Whose property was the 'process and machinery' to be when developed? The answer would seem to be inevitable and resistless—of him who engaged the services and paid for them. * * *"

See, also, Goodyear Tire & Rubber Co. v. Miller (C. C. A. 9th) 22 F.(2d) 353; Magnetic Mfg. Co. v. Dings Magnetic Separator Co. (C. C. A. 7th) 16 F.(2d) 739; British Reinforced Concrete Co. v. Lind, 86 L. J. Ch. N. S. 486, 116 L. T. N. S. 243, 33 Times L. R. 170; Air Reduction Co. v. Walker, 118 Misc. Rep. 827, 195 N. Y. S. 120; Wireless Specialty Apparatus Co. v. Mica Condenser Co., 239 Mass. 158, 131 N. E. 307, 16 A. L. R. 1170; Dental Vulcanite Co. v. Wetherbee, Fed. Cas. No. 3,810.

[4, 5] It is contended, however, that the rule which we have discussed has no application here, because it is said that defendant was not employed by the government as an inventor, or to invent the fumigant gas which is the subject of the patent, but merely to do ordinary work as a chemist, such as the analyzing of dust samples. The trouble with this argument is that it gives too narrow a meaning to the word "employed." The right of the employer to the invention or discovery of the employee depends, not upon the terms of the original contract of hiring, but upon the nature of the service in which the employee is engaged at the time he makes the discovery or invention, and arises, not out of the terms of the contract of hiring, but out of the duty which the employee owes to his employer with respect to the service in which he is engaged. It matters not in what capacity the employee may originally have been hired, if he be set to experimenting with the view of making an invention, and accepts pay for such work, it is his duty to disclose to his employer what he discovers in making the experiments, and what he accomplishes by the experiments belongs to the employer. During the period that he is so engaged, he is "employed to invent," and the results of his efforts at invention belong to his employer in the same way as would the product of his efforts in any other direction. In the Solo-

mons Case, supra, Clark was not employed as an inventor or to invent, but as Chief of the Bureau of Engraving and Printing. He devised the stamp, which was the subject of the patent, at the request of a committee of Congress, and was paid nothing for his efforts at invention other than his regular salary. In the case of British Reinforced Concrete Engineering Co. v. Lind, supra, the patentee Lind was employed as an assistant engineer, and made the invention for which the patent was granted when directed by his employer to design an appropriate lining for the heading of a coal mine. What we deem to be the correct rule was well stated by Judge Soper in the court below as follows:

"The broad principle is now laid down by the Supreme Court, too clearly to be misunderstood, that, when an employee merely does what he is hired to do, his successes, as well as failures, belong to his employer. Nor can it be said that one who willingly carries out the orders of his employer is not engaged upon that which he is employed to do. An employee, who undertakes upon the direction of his employer to solve a specific problem within the scope of his general employment, is as truly employed and paid for the particular project as if it had been described at the outset in the contract of employment."

[6] Defendant contends that the rule to the effect that inventions made by one employed to invent belong to the employer is based upon the presumed intention of the parties, and will not be applied where the employer, as in the case of the government, does not desire a monopoly. We think, however, that there is no sound basis for the distinction sought to be made. Even though the employer may not desire a monopoly on the rights in the invention, it may well be that he desires that it be thrown open to the public; and his desire to thus dedicate it to the public should not be thwarted because he does not desire monopolistic control. Let a case be supposed of a charitable foundation, which employs chemists and physicians to study diseases, with a view of discovering a cure for them, one of whose employees, in the course of experiments conducted for it, discovers a remedy which it is seeking, and for the discovery of which the experiments are conducted, and procures a patent on it. Should such employee be allowed to withhold the patent from the foundation for his own profit, merely because the foundation does not desire to monopolize the remedy but to give the benefit of the discovery to mankind?

To ask such a question is to answer it; and yet we do not think that the principle in-

volved is different from that involved in the case at bar. If there be any difference, there would be less reason in allowing an employee of the Public Health Service to withhold a patent from the government than in allowing an employee to withhold a patent from a private charitable organization. The Public Health Service represents the people of the United States. Its interest is their interest. Its investigations and discoveries are made for their benefit. And although neither it nor they have any interest in monopolizing inventions which may be made in the course of its studies and experiments, both have an interest in seeing that these inventions are not monopolized by any one. In the case of the fumigant gas developed by the defendant while employed and paid by the government to' develop it, they are interested, not only in the use which the Health Service itself may make of it, but also and primarily in having it supplied to the public as freely and cheaply as possible. It is unthinkable that, where a valuable instrument in the war against disease is developed by a public agency through the use of public funds, the public servants employed in its production should be allowed to monopolize it for private gain and levy a tribute upon the public which has paid for its production, upon merely granting a nonexclusive license for its use to the governmental department in which they are employed. We think, therefore, that the distinction, which complainant seeks to draw in favor of employees of the government has no basis in reason. The authorities hold that the ordinary rule is applicable in the case of such employees. Solomons v. U. S. supra; Gill v. U. S., supra; note in 16 A. L. R. at 1196.

[7] Finally, the contention is made that the parties did not intend that the government should have the right of ownership in the invention, but that it should have a mere nonexclusive license to make and use the gas under a patent to be secured by defendant, this contention being based upon the fact that the Chief of the Office of Sanitation and Hygiene approved of defendant's preparing the application for patent. There is manifestly nothing in this contention. In the first place, although, as stated, there had been some talk as to taking out a patent which was approved of by the Chief of the Office of Sanitation and Hygiene, when the consent of the Surgeon General was sought to the application for patent, he opposed the application acting upon the advice of the Solicitor General of the Treasury that the invention belonged to the government. In the second place, the invention was made before a patent was mentioned or apparently thought of by any one. Upon the principles heretofore discussed, it was the property of the governmnt. No official of the government was authorized to give away any interest in it, and no subsequent recognition of a right in defendant, not even a conveyance to defendant, could have conferred any right upon him or been binding upon the government. The Floyd Acceptances, 7 Wall. 666, 19 L. Ed. 169; Wisconsin Cent. R. Co. v. U. S., 164 U. S. 190, 17 S. Ct. 45, 41 L. Ed. 399; Sutton v. U. S., 256 U. S. 575, 441 S. Ct. 563, 65 L. Ed. 1099, 19 A. L. R. 403.

There was no error, and the decree of the District Court is accordingly affirmed.

Affirmed.