## MARSHALL v. COLGATE–PALMOLIVE–PEET CO.
### Civil Action No. 711.

District Court, D. Delaware.
Feb. 18, 1948.

Howard Duane, of Wilmington, Del., and Newton A. Burgess, of New York City, for plaintiff.

Hugh M. Morris and Alexander L. Nichols, of Morris, Steel, Nichols & Arsht, all of Wilmington, Del., and Benjamin B. Schneider and Max Dressler, both of Chicago, Ill., for defendant.

LEAHY, District Judge.

This is a hybrid action. In part, it is a declaratory judgment suit in which a plaintiff seeks judgment declaring that he has entire right in three inventions discovered during his employment by defendant. Each of the inventions is represented presently by applications for patents. In another part, the complaint alleges damages purporting to result from defendant refusing to consent to plaintiff's exclusive ownership of these inventions; and plaintiff thereby has been prevented from their full exploitation.

The complaint sets forth plaintiff's estimate of damages as, at least, $5,000,000, in addition to the salary which, since his resignation from defendant, he no longer receives. Defendant counterclaimed, denying plaintiff's exclusive right in the inventions and asserting ownership itself, or, at the least, the right to their use. As a concomitant defendant charges improper use by plaintiff of confidential information derived from the defendant company during his employment. Defendant denies any damages to plaintiff.

Findings of fact are made, followed by comment, and conclusions of law will then be stated.

1. Defendant has been engaged in the soap industry since early times. It has five large plants in the United States, and plants also in Canada and Mexico.

2. Plaintiff seeks an award of title under the Declaratory Judgment Act, 28 U.S.C.A. § 400, to three inventions made while in defendant's employ and to United States Patent Applications filed by plaintiff covering the inventions. Plaintiff also seeks damages for alleged losses due to defendant's failure to recognize his title thereto.

3. The inventions involved relate to:

(a) The manufacture of milled floating soap, as set forth in application Serial No. 591,553, filed May 2, 1945.

(b) A combination bar, made by uniting separate pieces of soap and a synthetic detergent, such as defendant's product "Vel", as set forth in application Serial No. 534,182, filed May 5, 1944, as a continuation-in-part of application Serial No. 462,513, filed October 19, 1942.

(c) The spraying of materials in solution on preformed particles, such as soap particles while suspended in gas or air (fluidized), as set forth in application Serial No. 587,404, filed April 9, 1945.

Some claims have been allowed in these applications.

4. Prior to his employment, plaintiff had many years experience in soap manufacture as well as some experience in other industries, and had recognized ability in production methods and in the development of new and improved procedures and products.

5. Plaintiff was employed by defendant on May 15, 1940, as Assistant to Mr. Coulter, Vice President in charge of production at a salary of $10,000 per annum.

6. Plaintiff received recognition by defendant. He was advanced rapidly in positions of authority and importance—and in salary. On January 15, 1941, he was made General Superintendent in charge of production over defendant's five factories in the United States and its Central Engineering Division, with an increase in salary to $15,000 per year. His salary was increased to $17,500 per annum on August 15, 1942. On April 1, 1943, plaintiff was appointed Director of Engineering at a salary of $20,000 per year. In each of the years 1941, 1942, 1943 and 1944, plaintiff received a bonus of $5,000, which was in addition to his salary.

7. The position of Director of Engineering was new, created at the time of plaintiff's appointment to it. There had been no position of this importance prior to this time. The necessity for new products and processes as well as that of revamping defendant's plants and plaintiff's suitability for such work were important considerations in its creation. Plaintiff was so advised. In his positions as General Superintendent and as Director of Engineering, plaintiff "put across" $2,000,000 worth of construction work and handled the engineering arrangements for a $9,000,000 post-war construction project for defendant. He was made head of a committee appointed to carry out this project in which committee the Research Director, the Vice President in charge of the Research Department, and the manufacturing head of the Jersey City plant of defendant were also members. The decision to go forward with this post-war progress was "one of the most important decisions" that had ever been made by defendant.

8. Plaintiff's inventive ability had been a subject of discussion between him and defendant's officers prior to plaintiff's employment. He had submitted inventions to Coulter in opening the conversations which led to plaintiff's employment. He had also advised Coulter that he had made inventions in his work for a previous employer, the Kellogg Company, and had assigned them.

9. In the conversations immediately preceding the employment of plaintiff by defendant, the improvement of defendant's products, such as floating soap, and of its equipment were discussed by plaintiff and Coulter; and Mr. Little, defendant's president, told plaintiff that defendant was in need of a man "with large experience to help us develop new products, new processes to bring our plant and organization up-to-date." Plaintiff's letter of April 12, to Coulter (PX-36E) indicates that development of equipment, processes and products were discussed during the conversations leading to plaintiff's employment by defendant.

10. Plaintiff, in his answer to the counterclaim, has admitted the truth of a part of paragraph 15 thereof, which reads as follows:

"Plaintiff was employed by defendant on or about May 15, 1940 with the understanding and agreement between plaintiff and defendant that plaintiff would employ his knowledge, experience and efforts in the improvement of the products, equipment and processes of defendant."

11. In plaintiff's first assignment as assistant to Coulter, his duty was to familiarize himself with the plants, processes, products, personnel and organization of defendant so that he could report to Coulter "such changes, corrective measures, that in his judgment seemed advisable." To that end plaintiff was early brought into intimate contact with the work of the Research and Development Division, under Dr. Dreger. A committee under Adams was set up to study the work of the Research and Development Division and effect its reorganization. Within two months of his employment by defendant, on July 3, 1940, plaintiff was placed on this Committee.

12. Plaintiff was an active member of the Adams Committee. The meetings of that Committee began on July 8, 1940. There were twenty-four meetings before the end of the year and plaintiff attended all of them. At these meetings, Dr. Dreger fully disclosed the problems upon which the Research and Development Division was working and the progress made upon them. These disclosures were supplemented by memoranda written by Dr. Dreger on cer-

tain problems, copies of which were sent to the committee members. Plaintiff was thus made fully acquainted with defendant's research and development work in the latter half of 1940.

13. The production of a floating soap was one of the problems upon which the Research and Development Division was working in 1940. The work of the Research and Development Division on this floating soap problem was fully discussed by Dr. Dreger at the meetings of the Adams Committee at which plaintiff was present.

14. A Central Engineering Division was set up in the latter part of 1940 and men were transferred to it on the authority of plainiff as Assistant to the Vice President in charge of manufacturing. An organization line was set up by the Adams Committee, of which plaintiff was a member, between the Central Engineering Division and the Research Department, the responsibility for initial development work being placed on the Research Department and for working out and erecting commercial plants, on the Central Engineering Division. This involved the working out of new processes and equipment on a plant scale. Inventions arose in this work. Plaintiff was in charge of or head of the Central Engineering Division from January 15, 1941, when made General Superintendent, until he left defendant's employ.

15. It was the practice in defendant's Central Engineering Division, in the period of plaintiff's employment, that inventions made therein be assigned to defendant, and for the Patent Division to prepare and file patent applications thereon. The assignments were made at the times when the applications were signed. This was in the absence of written agreements to assign.

16. Plaintiff's conduct indicates that he was fully aware of this practice and aided in maintaining it in effect. On April 3, 1942, and on May 4, 1942, he wrote Mr. Trowbridge, defendant's general counsel and in charge of its Patent Division, and to Mr. Meredith, head of the Patent Division, respectively, with regard to procedures for putting this practice into effect. In July, 1943, plaintiff, for the same purpose, set up a patent committee in the Central Engineering Division to "review both Engineering work and Production ideas from the standpoint of patent protection." The reports of this Committee were transmitted to the Patent Division through plaintiff. He insisted as early as May 4, 1942, and again on May 25, 1943, that all matters going from the Central Engineering Division be cleared through him. An attorney in the Patent Division, employed in January, 1943, was especially assigned to work with plaintiff on matters arising in the Central Engineering Division.

17. Plaintiff himself conformed to this practice in his Central Engineering Division and required the men in the Division to do so. He stated to Coulter that he would, as a matter of course, assign to defendant the first invention which he made during his employment by defendant. On May 4, 1942 (DX-73), plaintiff made a like statement in a letter transmitting to the Patent Division a disclosure of an invention he had conceived relating to improvements in Vel. In fact, he assigned to defendant all inventions which he made during his employment by defendant *except the three in controversy here.* When an engineer, Mahoney, was employed in December, 1944, to work under plaintiff's direction on one of the inventions here involved (spraying on a fluidized bed), plaintiff instructed Mahoney that any inventions he might make must be assigned to defendant.

18. In conformity with this practice, plaintiff himself, in dealing with outside consulting engineers for engineering services, required that they agree to assign any resulting inventions to defendant. This he did, for example, in the agreements he made with the consulting engineer Hoopes in connection with the development of machinery relating to tube manufacture and for making soap with inserts. Plaintiff put a like provision in the agreement which he negotiated with the consulting engineering firm, Burns & Roe, for services to defendant.

19. Plaintiff expressed dissatisfaction with the speed with which defendant's Patent Division was handling the patent

work of the Central Engineering Division from the standpoint of protection of defendant's interests. As a result, a meeting was held on June 18, 1943, in Coulter's officer, attended by plaintiff, Coulter, Trowbridge, defendant's general counsel, and representatives of defendant's Patent Division and of its Research and Development Department, at which it was decided to have a further meeting of plaintiff and representatives of the Patent Division to set up an order of precedence in handling new ideas of the Central Engineering Department.

20. At this meeting of June 18, 1943, plaintiff presented a memorandum dated June 18, 1943, which included a list of thirteen major projects containing "pioneering elements" which the "Engineering Division has under active development." Two of the items on the list, "Combination Bar" and "Floating Milled Soap," are involved here. The third invention involved here had not yet been conceived. Plaintiff's memorandum of June 18, 1943, states:

"The time has come when a sound procedure must be set up to guard the company's interests and to satisfy the Engineering Division that it is not derelict in its own responsibilities."

21. Plaintiff at all times indicated that he was safeguarding defendant's interests without reservation in carrying out the Central Engineering practice of assigning patentable inventions to defendant. He had a strong feeling that naming joint inventors on a patent application weakened the protection which it gave defendant. After it was explained to him that this was a matter to be resolved on the facts in each case, plaintiff wrote to Trowbridge, defendant's general counsel, on February 1, 1944, as follows:

"Under our present system we make it very difficult for one person to invent a basic idea and carry it through the patent application stage without picking up some co-inventors enroute.

"Attached is a clipping from last week's Business Week which clearly shows how important it is to our Company to have the patents granted to individuals and assigned to the Company.

"Personally, I am about convinced that the only recourse I can follow under the policies of the Patent Division is to arrange to file an application on the idea before I disclose it to any of my subordinates. I mean, of course, file it through our Patent Division and assign it to the Company."

22. As late as January, 1945, only shortly before leaving defendant, plaintiff expressed his acquiescence in this practice as a Company policy. In an effort to work out a form of written agreement to assign inventions to be executed by employees required to assign inventions, a draft form was prepared and was submitted by Coulter to plaintiff to secure his comments and those of Reddert, Chief Engineer in the Central Engineering Division. This was not a final form, which plaintiff was expected to sign, but merely a "trial balloon" in an effort to formulate one. Plaintiff so understood it and in transmitting it on December 12, 1944, to Reddert, described it as something "we are trying to formulate." When plaintiff sent his own comments and those of Reddert to Coulter with his letter of January 5, 1945, he expressed his continuing acquiescence in the practice of assigning inventions, saying:

"* * * Whatever position is taken we will try to execute conscientiously."

23. The evidence clearly shows that there was a consistent practice in the Central Engineering Division under plaintiff of filing and assigning applications on patentable inventions and that plaintiff enforced it and complied with it himself.

24. Again and again in his testimony plaintiff referred to an understanding relative to his rights to the inventions in controversy here, which he alleges that he had reached with Coulter in a conversation on November 12, 1942. Little denied that anything was said about title to the inventions developed by plaintiff prior to plaintiff's letter of June 12, 1944. Under cross-examination, the alleged understanding with Coulter evaporated. Plaintiff was on the stand:

"Q. Then you didn't in that conversation with Mr. Coulter, attempt to define the relative rights with the company and yourself to use the supposed inventions? A.

No, I didn't. I attempted to do that in my letter of June 12, but I didn't attempt it in that early understanding, no sir."

27. On cross-examinaion, plaintiff testified that he told Little at a conference in his office on February 9, 1945, that he could not assign the inventions to defendant "because of the value of these inventions and the pride I had in them." Trowbridge stated that plaintiff repeatedly gave financial reasons as his motive for proposing in his letter to Mr. Little of June 12, 1944 (PX-23), that plaintiff should be given title to the inventions in suit.

28. Plaintiff refers also to his letter of June 12, 1944 to Little (PX-23) as a restatement of his alleged "understanding" with Coulter. At the trial, plaintiff took the position that since Little did not reply to his letter until after receiving plaintiff's letter of February 5, 1945 (PX-25), the delay in replying to the letter of June 12, 1944, was an acquiescence in its terms.

29. The letter of June 12, 1944 (PX-23), is a request that plaintiff, for financial reasons, be permitted to retain title to patents on certain inventions, which plaintiff identifies as those involved in the suit at bar. This letter is not a confirmation of any existing agreement; it is inconsistent with the existence of the agreement asserted by plaintiff. Defendant did not assent to the requests contained in this letter.

30. Plaintiff did not regard the delay in responding to this letter as acquiescence in the request made therein, as he clearly indicated in his letter of February 5, 1945 (PX-25). Although plaintiff, as head of a substantial post-war construction program of defendant, met frequently with Little, he did not speak to him about this request at any time prior to his letter of February 5, 1945.

The Facts as to the Floating Soap Project.

31. Prior to and continuing during plaintiff's employment by defendant, the development of an improved floating soap competitive with other products on the market was of great concern to defendant and was characterized as a "must" by its president. On joining defendant and soon thereafter, plaintiff was advised of this interest of defendant. He was familiar with the work being done by defendant's Research and Development Department on this subject, but was dissatisfied with its rate of progress on the problem. He expressed his dissatisfaction in his letter to Coulter of August 6, 1942, and orally to the officers of defendant.

32. In November 1942, plaintiff proffered to Coulter help in working out an improved white floating soap, but because of his dissatisfaction with the progress made in the Research and Development Division and of jealousy between departments, plaintiff wished to work this out independently of the Research and Development Division. Plaintiff repeated these requests in his letter of November 12, 1942.

33. The matter was taken up with Little because it involved crossing organization lines. In view of the importance of the subject matter and plaintiff's certainty that he could develop a floating soap for defendant within a reasonable time, Mr. Little acceded to plaintiff's request and assigned to plaintiff the problem of developing a floating soap, without going through the Research and Development Division. Dr. Dreger, head of the Research and Development Division, was promptly notified that this problem had been assigned to plaintiff and was requested to cooperate with plaintiff. This is confirmed by plaintiff's own statements in his disclosure memorandum of January 15, 1943.

34. The assignment was general and was not limited to a specific method or procedure in plaintiff's discussions with Coulter and Little, nor was any specific method or procedure mentioned in the meeting with Dr. Dreger. When plaintiff advised Reddert, Chief Engineer in the Central Engineering Division, of the situation early in 1943, he stated his assignment to the problem of developing a floating soap generally.

35. Plaintiff himself recognized the general character of his assignment. In his "disclosure" of January 15, 1943 (PX-5), he states:

"On December 7th Mr. E. H. Little and Mr. J. A. Coulter gave me 'carte blanc' to proceed with this project (see letter E.H.L. to J. A. C. dated 12/1/42)."

After almost a year's work in the Central Engineering Division, when plaintiff proposed to change the direction of the work from the use of wires in a plodder to produce a honeycombed soap bar, to the use of directly introduced air, he wrote in his letter of December 20, 1943 (PX-9):

"I think it is important to the Company and to myself that *as I direct the work on the aeration experiment,* we do not introduce a number of other inventors, simply because these engineers are being assigned to the problem."

In a memorandum report of the same date on work which had been done, he wrote (PX-7):

"Since being directed, on December 7, 1942, *to proceed with the development of a milled floating soap,* we have completed a year's work and wish to set down at this time the status of the problem."

In this memorandum plaintiff stated that the introduction of air, on which he proposed to continue work, was part of his original concept as set down in his disclosure of January 15, 1943.

36. Plaintiff initiated work on the development of floating soap in the Central Engineering Division early in 1943 and he directed that work, using defendant's facilities and employees during almost the entire year of 1943, at an expense to defendant exceeding $5,000. During this period the work was confined by plaintiff to the production of soap having longitudinal holes by the use of a plodder with core wires and plaintiff rejected suggestions of the engineers working under him that instead of wires, the introduction of air be used in this work.

37. The results of the year's work showed that the methods being pursued by plaintiff during that time were impractical. However, in his report of December 20, 1943 (PX-7, p. 2), plaintiff stated that "the work we have done to date, and the samples obtained clearly prove its practicability."

38. In the same report of December 20, 1943 (PX-7), plaintiff proposed to proceed further in carrying out his assignment to develop a floating soap by the direct introduction of air into the plodder as a part of his original program, this being the process of application No. 591,553, here in suit. He stated in that report:

"As stated above, I believe we should now rest on the mechanical honeycombing process and bend our efforts toward aeration in the plodder during the coming months, using what we have learned by the work we have done with the coring wires to advance the aerating problem. I repeat that this was set down in my description dated January 15, 1943, and forwarded to the Patent Division for their recording at that time."

39. Plaintiff did not proceed with this planned work in the Central Engineering Division. He had drawings made by a draftsman from that division and he made some experimental model parts at home, using the services of defendant to secure the necessary materials. Using these model parts made at home, he explained his proposed process to Little and Dr. Dreger on June 28, 1944. He prepared a conception disclosure dated January 5, 1944, relative to this work, sending a copy to Meredith.

40. Plaintiff's reason for not proceeding with this phase of the development as originally planned was to avoid a possible joining of co-inventors. It was for this reason that he insisted in his report of December 20, 1943 (PX-7) that this phase of the development was part of his original conception of the problem. It would appear it was not for the purpose of retaining title, for in his letter of February 1, 1944 (PX-6) to defendant's general counsel, he made direct reference to the floating soap development and in the same letter said:

"Personally, I am convinced that the only recourse I can follow under the policies of the Patent Division is to arrange to file an application on the idea before I disclose it to any of my subordinates. I mean, of course, file it through our patent division and assign it to the company * * *."

41. Plaintiff indicated to other members of defendant's organization that the work he was doing on the floating soap development in suit was for the benefit of defendant and that it was part of one floating soap project with the work on the honeycomb bar.

42. In short, the evidence discloses that the work on the aerating procedure for making floating soap, as defined in Patent Application Serial No. 591,553 was done in pursuance of the original assignment to plaintiff of the problem of developing a floating soap.

### The Facts as to the Combination Bar Project.

43. Application Serial No. 534,182, filed May 5, 1944, involved in suit, relates to a combination bar formed by uniting a piece of soap and a piece of synthetic detergent. It is a continuation-in-part of application Serial No. 462,513, filed October 19, 1942.

44. Defendant made and marketed a synthetic detergent "VEL" prior to plaintiff's employment. The combining of Vel and soap in some way was an important problem with defendant; another "must". The task of developing a combined Vel and soap was given plaintiff long before plaintiff first brought a combination bar to the attention of defendant's officers.

45. Plaintiff realized the importance of Vel to defendant. In his letter of May 4, 1942 (DX–73), transmitting a disclosure of an improvement in Vel, which he said "of course belongs to the Colgate-Palmolive-Peet Company," plaintiff wrote:

"I feel very strongly that Vel is going to become a very important product to our Company."

46. Plaintiff first brought a combination bar to the attention of defendant on October 16, 1942, at a meeting at which defendant's president and several vice-presidents were present. Plaintiff says no interest was shown, but Little says he was "very much pleased."

47. Plaintiff recalls the bar presented by him at this meeting as a plug bar; i. e., a bar with a plug of Vel inserted in a cavity in a bar of soap. However, Little recalls it as a bar which was half Vel and half soap, joined in an unsatisfactory way. Contemporaneous circumstances confirm Little's recollection. In plaintiff's first application on the subject, filed only three days after this meeting, he described the bar as Little recalls it. In giving instructions for the making of such bars for display at a meeting of defendant's superin-

tendents in December, 1942, plaintiff asked merely that a piece of Vel and a piece of soap be pressed together. This was tried, but the parts separated. It was not until the plant foreman working on the problem suggested a mechanical interlocking that the parts could be made to stay together.

48. In plaintiff's letter of November 12, 1942 (PX–2), requesting the assignment to develop floating soap, plaintiff also asked to be assigned the development of a Vel product. In the conversation with Coulter preceding and following this letter the Vel product referred to was the combination bar.

49. The problem of developing a combination bar was assigned to plaintiff at the same time as that of developing a floating soap, by Mr. Little's letter of December 1, 1942 (PX–3).

50. Pursuant to this assignment, a project was set up by plaintiff in defendant's Central Engineering Division in April 1943, and work was started on the project in that Division in May 1943 under plaintiff's direction and continued throughout plaintiff's employment by defendant. More that $3,500 was expended by defendant in labor and materials on this project.

51. In this work, the men in defendant's Central Engineering Division worked out the interlocking means necessary to reduce the combination bar invention to practical form. These locking means were incorporated by plaintiff in the drawings of his continuation-in-part application here involved.

52. Plaintiff says that these locking means were independently worked out by him at home, but admits that he failed to advise the men in the Central Engineering Division of this work.

53. Plaintiff also included in his continuation-in-part application on the combination bar here in suit the results of a skin irritation test made for defendant. Such tests are regarded as confidential, with only a limited distribution within the defendant company. He also included in that application charts illustrating tests and processes taken from a record of proceedings of a meeting of defendant's superintendents which plaintiff had him-

self, as General Superintendent, designated as confidential.

54. The combination bar development was treated by plaintiff as belonging to defendant. He included it as one of the major projects of the Central Engineering Division with "pioneering elements" to be taken up with the Patent Division for patent protection at the conference of June 18, 1943, "to guard the Company's interest."

55. When plaintiff filed his first combination bar application, he did not advise defendant's officers that he was not filing it through defendant's Patent Division or that he was claiming rights in it apart from defendant. On June 18, 1943 (DX–25), he listed the combination bar project as one to be covered by the Patent Division "to guard the Company's interest." On July 30, 1943 (DX–47), when he first advised the Patent Division that he had filed this application, he stated that he had done so "to hold protection over the idea until such time as I could arouse an interest." Defendant was not advised of the filing of the continuation-in-part application here involved. There was no indication to defendant under these circumstances that plaintiff asserted rights or title to the combination bar invention apart from those of defendant.

56. In short, the evidence discloses that the work on the combination bar, as defined in Patent Application Serial No. 534,182 was done in pursuance of the original assignment to plaintiff of the problem of developing such a bar.

### The Facts of the Problem of Spraying on Fluidized Particles.

57. The subject of the third invention involved in suit, as represented by application Serial No. 587,404, has to do with the spraying of solutions on preformed particles (soap particles formed by spray drying), which are maintained in air or gas suspension. The solutions used may be builder or soap solutions and the purpose of the process is to increase the size or change the characteristics of the particles subjected to the process.

58. The term "post-spraying" has been and is applied in defendant's organization to processes in which particles of soap, after formation, are subjected to a spray of some solution to coat its exterior. Plaintiff now objects to the application of the term "post-spraying" to his process on the ground that he supports the formed particles being sprayed in a different manner than was previously used. However, he has himself described the products resulting from his process here involved as "post-sprayed granules"; and the term "Post-Spraying" was employed in the Central Engineering Division in setting up a project for work on his invention.

59. In 1943 plaintiff was assigned to the task of developing the post-spraying of sprayed products and so stated to Reddert, defendant's Chief Engineer, at the same time that he advised Reddert that he (plaintiff) had been given the job of developing a floating soap. A project on post-spraying was set up in defendant's Central Engineering Division on February 19, 1943 (DX–83), and work proceeded on this project during 1943.

60. On January 5, 1944, in justifying his views or his work on post-spraying, plaintiff wrote (DX–63):

"I want you to know a little history on post-spraying so that you can better appreciate my conscientious efforts *to protect our company's interests.*" (Emphasis added.)

Soon after this in a memorandum dated February 7, 1944 (PX–12), plaintiff proposed further work on the post-spraying project. Shortly after this, on March 28, 1944, he prepared the first of his so-called invention records of the type of post-spraying process here in controversy (PX–19). This was followed by a more complete disclosure on April 5, 1944 (PX–20), in which he stated that this development was "something our Division should explore".

61. Shortly after this, on April 14, 1944 (DX–64), plaintiff instructed Reddert to start work in the Central Engineering Division on post-spraying in accordance with these disclosures, using an air table as a means for maintaining the particles being sprayed in suspension. This was to be a study of the process "as it may apply to our business" and again plaintiff pro-

posed to set the development up as a major project in the Central Engineering Division.

62. Work was started on this development. Drawings were made (DX-65). Plaintiff requested from defendant an authorization to spend up to $10,000 on this work. Because it was not possible to get priorities to obtain the air tables, the Central Engineering Division was unable to proceed with the development at this time.

63. On August 14, 1944, in a memorandum rather fully discussing the invention (DX-67), plaintiff proposed to get the services of an outside engineer to assist in the work. Steps were taken in this direction and are referred to in plaintiff's memorandum of October 27, 1944 (PX-22). This engineer was to carry on the work through the design stage and the laboratory stage and to design and supervise a pilot plant. The engineer was employed about December 18, 1944.

64. In the meantime plaintiff devoted himself to explaining his proposed process and received the assignment for his Engineering Division to proceed with this development. This was at the Manufacturing Committee Meeting of November 21, 1944, as shown by its minutes of November 22, 1944 (DX-81).

65. The engineer employed for this work was, at the outset, advised by plaintiff that if he made any inventions, they were to be assigned to defendant.

66. On the same date the engineer was hired for this work, a project was set up in defendant's Central Engineering Division. On December 20, 1944, plaintiff advised Coulter that the work on the project had begun (DX-92). He requested and secured an authorization to spend up to $10,000 on this work. The work proceeded in the Central Engineering Division, and before plaintiff left the employ of defendant, he had requested and secured an authorization to spend up to an additional $50,000 on this project.

67. During the latter portion of plaintiff's employment, it became necessary to provide additional cooling capacity for defendant's sprayed soap product "Super Suds" at two of its plants. Plaintiff took this opportunity to develop basic information in connection with the post-spraying invention involved in the suit at bar and to develop designs that would enable him to use the projected cooler construction as a part of his proposed pilot plant.

68. The work of designing and the ordering of equipment for the cooler portion of the projected design proceeded under plaintiff's own direction with estimated expenditures for the two plants involved of over $22,000.

69. Engineering work was done by defendant's employees both on the cooler portion of the design and on the specific subject matter involved in plaintiff's application here in suit. Drawings were made in the Central Engineering Division, one of which (DX-70) corresponds in all essential respects with a drawing of plaintiff's application Serial No. 587,404, here involved.

70. The post-spraying development here involved and represented by plaintiff's application Serial No. 587,404 is part of a continuous chain of development, upon which work was done by defendant's employees and at defendant's expense under plaintiff's direction. This specific form of post-spraying, using the fluidized or aerated bed of preformed particles was likewise assigned to plaintiff for development at his own insistence. The evidence indicates he used the services of defendant's Central Engineering Division and of a specially employed engineer, at the expense of defendant, to work up his ideas to the point represented by his application for patent.

71. The only work done at home by plaintiff on this subject was to study the matters involved. The only actual experimental work which he described at the trial as having been done at home was done after the date of filing the application. Except for such thought as plaintiff may have given the subject at home, the work involved in the development of the subject matter contained in application Serial No. 587,404 was done at defendant's plant by its employees and at its expense.

72. In short, it would appear that the inciting motive in plaintiff's effort to keep

title in these inventions was plainly expressed by him at his conference with Little, defendant's president, on February 9, 1945, at which he testified that he stated:

"I left the conference repeating that because of the value of these inventions and the pride I had in them, that I did not see how I could assign them."

*Comment.*

■ The law on the question involved in this case, viz., does employer or employee have title to the inventions, seems to be settled. The problem is interpreting and reconciling the dispute in the facts. The general rule is that title to an invention made by an employee in the course of his general employment remains in the employee, unless he has agreed, either expressly or impliedly, to transfer ownership to his employer; and, in the absence of any such agreement to assign, the employer is entitled merely to a non-exclusive, non-transferable shop right, or irrevocable royalty-free license to use the invention. United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 85 A.L.R. 1488; Pressed Steel Car Co. v. Hansen, 3 Cir., 137 F. 403, 2 L.R.A., N.S., 1172, certiorari denied 199 U.S. 608, 26 S.Ct. 749, 50 L.Ed. 331.

■ There is, however, a limitation upon the general rule. Circumstances may exist which create an obligation on employee to assign inventions to employer, in the absence of an express agreement to assign. This limitation on the general rule was recognized in Solomons v. United States, 137 U.S. 342, 346, 11 S.Ct. 88, 89, 34 L.Ed. 667, when the Court said: "But this general rule is subject to these limitations: If one is employed to devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer. That which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer." Again, in Gill v. United States, 160 U.S. 426, 435, 16 S.Ct. 322, 326, 40 L.Ed. 480, the Court said: "The fact that he made use of the time and tools of his employer, put at his service for

the purpose, raises either an inference that the work was done for the benefit of such employer, or an implication of bad faith on the patentee's part in claiming the fruits of labor which technically he had no right to enlist in his service." The obligation may arise where the employee has been assigned the task of developing a device or a process and accepts that assignment. Solomons v. United States, supra; Gill v. United States, supra; Standard Parts Co. v. Peck, 264 U.S. 52, 58, 44 S.Ct. 239, 68 L.Ed. 560, 32 A.L.R. 1033; Houghton v. United States, 4 Cir., 23 F.2d 386, certiorari denied 277 U.S. 592, 48 S.Ct. 528, 72 L.Ed. 1004; Dinwiddie et al v. St. Louis & O'Fallon Coal Co., 4 Cir., 64 F.2d 303; Magnetic Mfg. Co. v. Dings Magnetic Separator Co., 7 Cir., 16 F.2d 739, certiorari denied 274 U.S. 740, 47 S.Ct. 586, 71 L.Ed. 1320; Goodyear Tire & Rubber Co. of Akron, Ohio v. Miller, 9 Cir., 22 F.2d 353; Wehr Co. v. Winsor, 6 Cir., 19 F.2d 231; Wireless Specialty Apparatus Co. v. Mica Condenser Co., Ltd., 239 Mass. 158, 131 N. E. 307, 16 A.L.R. 1170; Club Razor & Blade Mfg. Corp. v. Bindzsus, 131 N.J.Eq. 283, 25 A.2d 31, aff'd 133 N.J.Eq. 38, 30 A. 2d 31.

■ Moreover, the limitation upon the the rule applies to the relationship or the situation existing at the time of the discovery, and is not concluded by the original contract of hiring.

Houghton v. United States, 4 Cir., 23 F. 2d 386, 390, certiorari denied 277 U.S. 592, 48 S.Ct. 528, 72 L.Ed. 1004, neatly illustrates the point. In that case there was no written agreement. Houghton was a trained chemist and was employed as an assistant chemist by the United States Health Service. His duties consisted chiefly of analyzing samples of dust from industrial plants. Some time after his employment by the Public Health Service, Houghton was named as a member of a three-man board which was appointed to conduct investigations for the purpose of developing a fumigant gas. Houghton developed such a fumigant gas during the course of this investigation. It was contended that he did not have to assign the patent over to his employer because at the time he was employed he was not em-

ployed as an inventor, or to invent the fumigant gas, which was the subject matter of the patent, but merely to do ordinary work as a chemist. The Court, in rejecting this contention, said: "It matters not in what capacity the employee may originally have been hired, if he be set to experimenting with the view of making an invention, and accepts pay for such work, it is his duty to disclose to his employer what he discovers in making the experiments, and what he accomplishes by the experiments belongs to the employer. * * *

" 'The broad principle is now laid down by the Supreme Court, too clearly to be misunderstood, that, when an employee merely does what he is hired to do, his successes, as well as failures, belong to his employer. Nor can it be said that one who willingly carries out the orders of his employer is not engaged upon that which he is employed to do. An employee, who undertakes upon the direction of his employer to solve a specific problem within the scope of his general employment, is as truly employed and paid for the particular project as if it had been described at the outset in the contract of employment.' " In neither the Houghton case nor Magnetic Mfg. Co. v. Dings Magnetic Separator Co., supra, was there a written contract or agreement of any kind.

 I think the facts of the present case, as more specifically set forth in the findings made above, bring it within the exception to the general rule and results in making the inventions in suit the property of defendant.

The evidence shows it was the custom within the Central Engineering Division, of which plaintiff was head during this entire period, to assign inventions to the company. Plaintiff knew and complied with this custom in all matters except the three inventions which are here involved. At trial I asked plaintiff:

"Q. What I want to know is have you ever made any inventions that you did not assign other than the three applications in suit? A. No."

This brings the matter squarely within the doctrine of New Jersey Zinc Co. v.

Singmaster, 2 Cir., 71 F.2d 277, certiorari denied 293 U.S. 591, 55 S.Ct. 106, 79 L.Ed. 685. In that case it appeared that a general rule or instruction had been issued by the company to its employees requiring assignment of patentable inventions made or developed by employees while in the employ of the company. An employee named Singmaster knew and understood the purport of these instructions and by his conduct had assented to the obligation to assign. There remained only for the Court to ascertain that Singmaster had made the inventions in question during his employment by the company, whereupon it required the assignment of the inventions to the company.

The inventions in controversy here were admittedly made during his employment by defendant. True, there were no written instructions; but the constant practice in plaintiff's Central Engineering Division and his enforcement of the practice on men under him as well as on outside engineers and his own independent compliance in other inventions indicate to me assent on plaintiff's part that the inventions should belong to defendant.

Moreover, with respect to each of the projects in which an invention was made, the invention resulted or was developed in pursuance of specific assignments to plaintiff of the problems involved. At a certain meeting plaintiff presented a memorandum in which he suggested that "the Company" should consider "endeavoring to gain patent protection." Clearly, his solicitude, at the time, was for the protection of inventions for defendant, not for himself as he presently asserts. Attached to this memorandum was a list of thirteen major projects and it is significant that two of the three matters here involved are listed among these major projects containing pioneering elements to which the Company "should [consider] * * * endeavoring to gain patent protection."

Plaintiff seeks to escape the conclusions which I have reached by asserting an "understanding by which he reserved rights under his invention." Defendant denies such an understanding. I think the evidence supports defendant's view that there

was no such understanding. Plaintiff's statement of the understanding was contrary to the existing relationships between defendant and himself and wholly inconsistent with his subsequent conduct and his own statements in the memoranda and letters to defendant which I have already alluded to. Plaintiff urges very strongly, however, that defendant's failure to answer his asserted understanding in a certain letter was an acceptance of the terms of the letter. I disagree. In fact, a subsequent letter clearly shows that he himself did not regard the company's silence as assent to the stated understanding in his previous letter. The whole course of plaintiff's conduct, then, is inconsistent with the contention he now seeks to support but is perfectly consistent with the conclusion reached here.

Upon the basis of the findings made above, it is unnecessary to pass on the question of plaintiff's alleged $5,000,000 damage. The conclusions of law will now be stated—

(a) Having been made by plaintiff while in charge of defendant's Central Engineering Division in which there was a practice of assigning inventions to defendant, confirmed and enforced by plaintiff, the inventions of the applications here involved belong to defendant.

(b) Each of the inventions of the applications here involved having been completed and perfected to the state shown in the corresponding application within defendant's organization in pursuance of an assignment to develop the invention given to plaintiff and accepted and acted upon by him, the inventions belong to defendant.

(c) Each of the inventions having been developed to a workable or practical form as shown in the applications here involved by the employees of defendant, on defendant's time and at defendant's expense, defendant has an irrevocable right and license to use the same in its business.

(d) Plaintiff is required to assign each of the applications for patent here involved to defendant.

A form of decree may be submitted.