Philip Halpern, J.
In this suit in equity, the plaintiff seeks a judgment rescinding the assignment of certain patents to the defendant.
The plaintiff entered the employ of the defendant as a chemist in 1931. He had been educated at the University of Manchester where he had specialized in the chemistry of cellulose products; thereafter, he had had experience in that field in the employ of various wood pulp and paper manufacturing *357 companies. The defendant was engaged in the manufacture of cotton batting and other products made of both bleached and unbleached cotton fibers. The plaintiff was first employed by the defendant for a period of one week. Mr. Rogers, the then president of the defendant, informed the plaintiff that there had been trouble in the bleaching department of the defendant’s plant and that he wished to have the plaintiff examine the procedures then in use and to make suggestions or recommendations for their improvement. The plaintiff found that there had been some laxity in the observance of prescribed procedures and he made recommendations for the correction of the situation. His employment was then continued for an indefinite period upon the understanding that he would serve as the chemist of the company and that he would try to improve the processes used in the bleaching department.
The plaintiff’s work as the company’s chemist was of various kinds. He occasionally checked the operations of the bleaching plant, as he had done during the first trial week of his employment, but generally, routine checks of the strength and quality of the chemical solutions in use were left to other employees of the defendant; the plaintiff was called in only when trouble developed and an analysis or modification of the chemical solutions was required. The plaintiff was also asked from time to time to test or analyze various chemical products available upon the market to determine their suitability or usefulness for the defendant’s manufacturing operations. This work did not involve the use of the plaintiff’s inventive faculties but other work, undertaken by him in the performance of his duties, obviously did. He was the only chemist in the employ of the company and, in that capacity, he was repeatedly called upon to study problems arising in the plant and to undertake experiments to discover new processes or to improve the old processes in order to solve the problems. About one year after the commencement of the plaintiff’s employment, a laboratory was built for his use and the plaintiff was supplied with the books and equipment which he requested.
Early in the period of his employment, the plaintiff was asked to look into the problem of the flameproofing of bleached cotton fibers. The defendant had been using a process known as the White process which consisted of immersing the cotton in a solution of ammonium sulphate, ammonium phosphate and borax. This process was unsatisfactory because the finished product showed a tendency to turn yellow. The plaintiff was asked to try to improve the process so as to avoid this objectionable effect. The plaintiff addressed himself to the problem *358 and experimented with various solutions. He first experimented with adjustments in the White formula, and reported some improvement in the results obtained, on October 15, 1932. Thereafter, after extensive reading on the subject, he found an article in the Journal of the Society of the Chemical Industry, published in England, referring to the fact that an English chemist had used borax and boric acid to fireproof cloth. The plaintiff decided to try this for the flameproofing of the bleached cotton fibers. He eliminated the ammonium sulphate and the ammonium phosphate from the solution, leaving only the borax, and he added boric acid in accordance with the suggestion made in the English journal. After further experimentation, he found that a solution of borax and boric acid in proper proportions produced the desired result, free from the objectionable effects of the White process. The plaintiff submitted to Mr. Rogers a written report on the subject, dated September 25, 1933, which was headed ‘ ‘ Research on the Fireproofing of Cellulose Fibre ”. The opening paragraph of the report read: “ The object of the research was to improve the method of fireproofing as used in the plant of the Loekport Cotton Batting Co.” The process developed by the plaintiff was immediately adopted by the company for the commercial production of flameproofed bleached cotton and has been used by it ever since.
After the process had been in use for some time, the plaintiff advised Mr. Rogers and other officers of the company that he believed that the process was a patentable one and he suggested that a patent ought to be obtained “to protect ourselves By that expression, the plaintiff presumably meant that a patent was desirable in order to protect the company against the use of the process by competitors (cf. Marshall v. Colgate-Palmolive-Peet Co., 76 F. Supp. 378, 389, affd. 175 F. 2d 215). At Mr. Rogers’ request, the plaintiff wrote up the process in 1935 as the basis for an application for a patent; Mr. Rogers retained a patent attorney in New York City to prosecute the application. The application was made in the name of the plaintiff as the inventor but the plaintiff simultaneously executed an assignment to the defendant of any patent which might be issued upon the application. The patent was issued to the defendant as assignee several years later.
The plaintiff was absent from the plant for about a year and one half during the years 1938 and 1939 because of illness. He returned in January 1940, and resumed his duties as company chemist. Mr. Thomas D. Cole was then the general manager of the company and he succeeded Mr. Rogers as president upon the latter’s death in 1942. On numerous occasions *359 after kis return, the plaintiff was asked by executives of the company to find or develop a process to solve problems of a chemical nature which had arisen in the course of the company’s operations. For many of these problems, he was, unable to find a solution; for some, he found solutions which were recognized to be nonpatentable;, for others, he found solutions which he believed to be patentable and for which patent application were made, all of which were concurrently assigned to the defendant. Many of the patent applications were rejected or abandoned, but in three instances the applications were granted, and the, patents issued thereon represent the remaining patents in controversy in this action.
The company had been having trouble because of the high calcium content of the water available in Lockport. This had the effect of making the cotton fibers brittle and fragile. The defendant’s production manager discussed this with the plaintiff and asked him to. do what he could to find a method of softening the water. While the plaintiff was working- on the problem, a salesman called at the plant to sell a boiler compound designed to remove boiler scale. He was sent to the plaintiff by the defendant’s production manager and, after looking into the nature of the compound, the plaintiff conceived the idea of using it to soften the water used in the bleaching process. After experimenting and finding that the bleaching process was improved by the addition of the. compound, the plaintiff reported this to Mr. Cole by a letter dated February 26, 1941. This letter concluded “ I plan as quickly as possible to develop this into a patent application which will be assigned to the Lockport Cotton Batting Co.” Accordingly, a patent application was executed by the plaintiff on March 28, 1941, together with an assignment of the prospective patent to the defendant. A patent was. subsequently issued for the use of the compound, in the, bleaching process.
In the meantime, the defendant company had become interested in the use of cotton for building insulation and the executives of the company asked the plaintiff to work on the flameproofing of raw or unbleached cotton to be used for this purpose. It was felt that the boiling or bleaching of the cotton entailed unnecessary expense if the cotton was to be used, only as insulation. The plaintiff experimented with various methods of flameproofing unbleached cotton, without success. He finally consulted Dr. Flett of the National Aniline Company, who recommended that he use a surface tension depressant or detergent which he had developed and which was sold by the National Aniline Company under the trade name of Nacconal. The *360 plaintiff mixed this with the boric acid and borax which he was currently using for the flameprooiing of bleached cotton, and he found that the Nacconal caused the flameproofing solution to penetrate the unbleached cotton fibers to a sufficient degree to render them flameproof. This was the substance of the solution which was the subject of the third patent which was ultimately issued in 1951. Applications had also been made for the patenting of this mixture for its bacteriostatic and bactericidal effect, as well as for flameproofing, but these were rejected, as having already been covered by the patents held by the National Aniline Company.
The company had been using raw cotton for the manufacture of building insulating material, under a government subsidy program which reduced its net cost sufficiently to enable the company to make insulation out of it at a competitive price. However, in anticipation of the reduction of the government subsidy and its ultimate discontinuance, the company sought a less costly substitute for raw cotton. The plaintiff was asked by the company executives to experiment with oily sweeps, a cotton mill by-product. The oily sweeps, which were cotton fibers which had been contaminated by contact with lubricating oil in the cotton mills, were found to be of sufficient strength for use as insulating material, but the problem remained of finding a process for the removal of the oil. The plaintiff worked on this project without success for several years. He tried various methods of washing the cotton; some of them worked in the laboratory where the cotton fibers could be squeezed by hand but none of the processes which he evolved were found to be suitable for commercial production. In the course of his experimentation, the plaintiff recommended that the oily sweeps be washed in a hydra-pulper, a machine with which he had become familiar by reason of his papermaking experience, and he recommended the purchase of such a machine. The company bought a machine for $18,000 but the effort was not successful and the machine was ultimately sold as junk. One day, in the summer of 1947, the assistant production manager of the plant, acting on his own volition and without consultation with the plaintiff, tried the experiment of throwing a batch of oily sweeps into the solution of Nacconal, boric acid and borax which had been used for the flameproofing of unbleached cotton. He found, much to his surprise, that this worked fairly well and that a large part of the oil had been removed from the oily sweeps. He reported this to the president of the company who called in the plaintiff and asked him to work on this suggestion *361 and to try to perfect it to a point which would make it commercially usable. After experimentation, the plaintiff found that, with the addition of another detergent known commercially as Galgón, the oil could be removed from the oily sweeps by this process. Certain mechanical problems remained in connection with the control of the temperature and the exhausting of the oil vapors but these were solved by the plant management with the assistance of mechanical engineers consulted by them. The application for the patent was made in the name of the plaintiff, despite the fact that other employees had also contributed to the invention, and the plaintiff executed an assignment to the defendant simultaneously with the execution of the application.
The plaintiff’s employment by the defendant was terminated in October, 1954. There is a controversy as to whether the termination was brought about at the suggestion of the plaintiff or the defendant but there is no need to resolve that" controversy. It is undisputed that the plaintiff had been absent from work for several weeks and that he was not physically able to return to work in October 1954, partly because of injuries which he had suffered in an accidental fall at home, and partly because of other reasons. The defendant offered the plaintiff a retirement allowance which it believed would be sufficient, together with social security benefits, to meet the plaintiff’s minimum requirements. The plaintiff was dissatisfied with the amount of the retirement allowance and rejected the defendant’s proposal. That controversy was apparently the genesis of this action, which was instituted in November, 1954. The plaintiff asserted in this action for the first time that the patents belonged to him and that he had been induced by fraudulent representations to assign them to the defendant. He accordingly sought a rescission of the assignments.
This action is based upon the premise that the plaintiff was equitably entitled to ownership of the inventions at the time when they were made and that the defendant acquired ownership of them only by reason of the assignments executed by the plaintiff. The first question to be decided is whether this underlying premise is correct, that is, whether the plaintiff or the defendant was equitably entitled to ownership of the inventions at the time they were made.
The principles governing the rights of the employee and the employer to an invention made in the course of employment are well settled but their application to specific factual situations has given rise to much litigation (see Costa on the Law of Inventing in Employment, 'passim). The mere existence of *362 the relationship of employer and employee does not entitle the employer to equitable ownership of an invention made by themployee. “ This is true even though the employee uses the time and facilities of the employer, although the latter in that event may have ‘ .shop rights therein, that is, the right to a free, non-exclusive, personal license to use the invention in his business.” (Marshall v. Colgate-Palmolive-Peet Co., 175 F. 2d 215, 217.) The employer is entitled to the ownership of the invention only if there was an express contract to that effect or, in the absence of an express .contract, (a) if the employee had been hired “ to invent,” i.e., to use his inventive faculties in the discovery of new products or processes for the employer, or '(b) even though the employee had not been originally hired/£ 1 to invent,” if he had been subsequently assigned to a specific research project which resulted in the making of the invention (United States v. Dubilier Condenser Corp., 289 U. S.. 178; Standard Parts Co. v. Peck, 264 U. S. 52; Houghton v. United States, 23 F. 2d 386, cert, denied 277 U. S. 592; Marshall v. Colgate-Palmolive-Peet Co., supra; Restatement, Agency, § 397).
It is my conclusion,, upon the evidence presented in this case, that defendant company was equitably entitled to ownership of the inventions under these principles. It seems clear to me that, at the time that the plaintiff was carrying on the research work which led to the making of the inventions, it was understood that the work was being done for the company and that the result of the research would belong to the company.
The plaintiff’s original employment was of a dual character; he was employed, in part, to do work of a noninventive "kind and, in part, to do research work requiring him to utilize his inventive faculties. The inventions in question were All made in the course of the performance of the latter portion of the plaintiff’s duties. Therefore, it can fairly be said that the plaintiff’s employment, so far as here rélevant, came within The concept of an employment “'to invent”.
’Furthermore, regardless of the nature of the plaintiff’s original employment, all the 'inventions here in controversy were .the .result of specific research projects to which the plaintiff had been assigned for the very purpose of obtaining the results which he ultimately succeeded in obtaining. If an employee is ¡specifically assigned the task of eamying on a research project with a view to discovering a new process or -product, any invention which the employee may make in carrying out the assigned project belongs to his .employer. 'This rule is based upon the simple proposition that the employee *363 had done the very thing which he had been employed to do. The end result therefore belongs to his employer (Standard Parts Co. v. Peck, supra).
“ The right of the employer to the invention or discovery of the employee depends, not upon the terms of the original contract of hiring’, but upon the nature of the service in which the employee is engaged at the time he makes the discovery or invention, and arises, not out of the terms of the contract of hiring, but out of the duty which the employee owes to his employer with respect to the service in which he is engaged. It matters not in what capacity the employee may originally have been hired, if he be set to experimenting with the view of making an invention, and accepts pay for such work, it is his duty to disclose to his employer what he discovers in making the experiments, and what he accomplishes by the experiments belongs to the employer. During the period that he is so engaged, he is ‘ employed to invent, ’ and the results of his efforts at invention belong to his employer in the same way as would the product of his efforts in any other direction” (Houghton v. United States, 23 F. 2d 386, supra, p. 390).
I therefore conclude that the defendant was equitably entitled to the ownership of the inventions at the time that they were made, although under patent law procedure the applications for the patents were necessarily made in the name of the plaintiff. In view of this conclusion, there can be no possible basis for a rescission of the assignments of the patents; the assignments merely formalized the existing situation and vested the legal ownership of the patents in the company which was already entitled to the equitable ownership. If the plaintiff had not voluntarily assigned the patents to the company, the company could have compelled him to do so by a suit in equity.
The precise circumstances under which the assignments were executed is thus of little materiality. However, I may say that I find that there was no false or fraudulent representation in the obtaining of the assignments. The only express representation of fact claimed by the plaintiff to have been made in connection with the execution of the assignments was a representation to the effect that it was the plaintiff’s duty to make the assignments to the company. The plaintiff testified that Mr. Rogers told him at the time of the execution of the assignment of the first patent that, under the law, the invention belonged to the company as the plaintiff’s employer and that the plaintiff had to assign the patent to the company. The plaintiff also testified that similar statements were made to him later by Mr. Cole as to some of the other inventions. Mr. Cole *364 denied having made the statements attributed to him. But even if the statements were made, they Avere not false or fraudulent; on the contrary, under the conclusion which I have reached as to the equitable ownership of the patents, the statements were entirely correct.
The plaintiff’s principal complaint upon the trial was that the officers of the company had promised him additional or extra compensation and that they had failed to fulfill their promises. The plaintiff claimed that, after he had executed the assignment of the first patent, he asked Mr. Rogers whether he would receive any royalty or bonus for his work and that Mr. Rogers replied that he saw no reason why a royalty of two or three cents a pound should not be paid, but the plaintiff admitted that Mr. Rogers shortly thereafter withdrew this statement because of the protests of the other executives of the company. However, the plaintiff claimed that, from time to time thereafter, Mr. Rogers promised in general terms that at some time in the future the plaintiff would be given additional sompensation for the work which he had done and that ultiJnately the plaintiff would be well compensated.
The plaintiff also testified that, on various occasions after the death of Mr. Rogers, he asked Mr. Cole whether he would receive extra compensation or a bonus for his work and that Mr. Cole assured him that he would be well taken care of and that he would be well compensated. It appears that the plaintiff’s salary was raised from time to time and he was paid bonuses in small amounts at the same time that bonuses were paid to other salaried employees of the defendant. But it is the plaintiff’s contention that these payments did not constitute full performance of the promises of extra or additional compensation.
Mr. Cole denied that any promises of extra or additional compensation were ever made but, even if it is assumed that such promises were made, they cannot sustain a recovery in this action. They cannot serve as a basis for the rescission of the assignments of the patents. The making of the alleged promises could not alter the legal situation as to the ownership of the inventions. The company was the equitable owner of the inventions and the assignments merely carried out the plaintiff’s obligation to transfer legal title to the equitable owner. The alleged promises of extra compensation would give rise to an action at law for damages for nonperformance, if they were sufficiently definite to be enforcible as express promises. But the promises, as testified to by the plaintiff, were too vague and indefinite to be enforcible as such (Varney v. *365 Ditmars, 217 N. Y. 223; Von Reitzenstein v. Tomlinson, 249 N. Y. 60). The only remedy of the plaintiff under these circumstances is to maintain an action at law based on quantum meruit, if he claims that the value of the services rendered by him, subsequent to the making of the promises, was greater than the amount of the compensation which lie received (Varney v. Ditmars, supra).
The present action cannot be retroactively converted at this stage into an action on quantum meruit for the value of the plaintiff’s services. The action was brought as one in equity solely for the purpose of obtaining a rescission of the assignments of the patents, together with an incidental accounting, if the rescission should be granted. There is no right to a jury trial in such an action, whereas in an action at law on the basis of quantum meruit the defendant would have the right to demand a jury trial. In this situation, this action must be dismissed and the plaintiff relegated to an action at law, if he desires to assert a claim on quantum meruit (Jackson v. Strong, 222 N. Y. 149; International Photo Rec. Mach. v. Microstat Corp., 269 App. Div. 485; cf. Twentieth Annual Report of N. Y. Judicial Council, 1954, pp. 293-314).
The complaint should therefore be dismissed, without costs, and without prejudice to the bringing of an action by the plaintiff on the basis of quantum meruit.