**Carl G. PREIS, Plaintiff,**

v.

**EVERSHARP, Inc., Defendant.**

**Civ. No. 15046.**

United States District Court
E. D. New York.

July 23, 1957.

---

5. 38 C.F.R. 8.26.

6. United States v. Zazove, 1947, 334 U.S. 602, 612, 68 S.Ct. 1284, 92 L.Ed. 1601.

Daniel A. Shirk, New York City, for plaintiff.

Cole, Grimes, Friedman & Dietz, New York City, for defendant, by Herbert J. Dietz, Sidney Friedman, and Harold M. Cole, New York City, of counsel.

RAYFIEL, District Judge.

The plaintiff, a former president of the defendant, sues to recover the sum of $39,930.56 which he claims is due him pursuant to an employment contract. The defendant alleges that the contract upon which the plaintiff relies is invalid for several reasons hereinafter stated, and, by way of counterclaim, seeks to compel the plaintiff to assign to it his interest in an application for letters patent on a new injector razor being manufactured by it.

The facts, briefly, are these: From 1906 to 1950, when he retired, the plaintiff was in the employ of American Can

Company, being Vice President, in charge of engineering, from 1944 to 1950. On July 27, 1944 he became a director of the defendant, a well-known manufacturer and distributor of mechanical pens and pencils, injector razors and blades. While a Director of the defendant, he served also as a member of its Executive Committee, and, after that Committee had been abolished, as a member of its Finance Committee. On February 6, 1952 the plaintiff was elected President of the defendant at a salary of $50,000 per year. There was no formal written contract between the parties.

Prior to his becoming President, the defendant's patent on the injector razor, which it had been manufacturing, had expired, and, because of the poor quality of the blades, their sales volume had declined, resulting in the loss of a substantial part of its blade market to competitors, particularly to the Pal Blade Company. Both the razors and the blades were manufactured for the defendant by American Chain and Cable Company of Bridgeport, Connecticut.

After his election as President, the plaintiff established and successfully carried out a program to improve the quality of the razor blades. Later in 1952, he conferred with various employees of the defendant with a view toward developing a new injector razor which would correct some of the defects in the old one, the patent on which had expired. The chief defect lay in the inability to open the head of the razor to permit the cleaning of the blade, thereby preventing its clogging with soap. The plaintiff caused several models to be prepared, in which the heads could be opened, but they proved undesirable because the cleaning of blades would require manual handling, thereby creating a hazard to the user. The plaintiff then suggested to one Kuhnl, an inventor employed by American Chain and Cable Company, who had invented the original injector razor, that the blade could be held in place by two pins, which would permit the head to be opened and allow the blade to float on the pins and thus be cleaned without the necessity of removal. Kuhnl experimented with this idea and finally, in March, 1953, developed a working model which accomplished this result. The application for the patent named both the plaintiff and Kuhnl as the inventors. However, Kuhnl had an agreement with his employer, American Chain and Cable Company, which provided that all inventions made by him on the razor would become the property of the defendant. Accordingly, he assigned his interest therein to the defendant.

The plaintiff then sought and obtained from the defendant's Board of Directors authorization to expend the sum of $550,000 to tool up in preparation for the manufacture of the new razor, the actual cost of which was about $100,000 in excess of that amount. Then, early in 1954, the new razor was placed on the market, and was extensively advertised on a national scale by the defendant.

On August 23, 1954 a meeting of the defendant's Board of Directors was held at which the plaintiff submitted his resignation as President. The minutes of that meeting disclose that a resolution was unanimously adopted by the Board, wherein the defendant agreed to pay to the plaintiff "as severance, the equivalent of his present salary for the remainder of this calendar year ($16,666.67), plus $25,000 payable in equal monthly instalments ($1736.11) over a period of twenty-four months (beginning September 1, 1954); * * *. It was understood that Mr. Preis was to be available for consultation with the new President (Mr. Fred J. Young) but that the severance payments were to be made even though he (Mr. Preis) became incapacitated so that he could not perform any consultative services or should die." (matter in parentheses added) (plaintiff's Exhibit 1.)

The total amount to be paid to the plaintiff under the said resolution was $41,666.67. Only one payment of $1,736.11 was made thereunder. The evidence disclosed that after the plaintiff's resignation as President, demand was made upon him to assign his interest in the

said patent application to the defendant. He refused, and the defendant discontinued further payments under the resolution. The plaintiff then commenced this action to recover the balance of $39,930.56.

I shall first consider the defenses interposed by the defendant. They are as follows: 1. That the agreement sued under herein is void since it was not to be performed within one year, and there was no adequate note or memorandum thereof in writing, signed by the party to be charged thereby, or its agents. (Sec. 31, Sub. 1. New York Personal Property Law, McKinney's Consol.Laws, c. 41.)

2. That since the said agreement was not to be performed within one year, such note or memorandum thereof as there was was insufficient, inasmuch as it did not contain all of the substantial or material terms of the contract. (Sec. 31 of the New York Personal Property Law, McKinney's Consol.Laws, c. 41.)

3. That there was no consideration for the agreement.

4. That the agreement was ambiguous and vague, and, therefore, void.

5. That the plaintiff's refusal to assign the patent application constituted a breach of his fiduciary duty to the defendant and that, therefore, he forfeited his right to receive payment thereunder.

■ I find no merit in any of those defenses. The minutes of the meeting of August 23, 1954, signed by the Secretary of the defendant, are clear and unequivocal, and the agreement constituted thereby does not come within the Statute of Frauds. (Section 31 of the New York Personal Property Law, McKinney's Consol.Laws, c. 41.) In the case of Argus Co. v. Mayor, etc., of City of Albany, 55 N.Y. 495, at page 501, similar to the case at bar, the New York Court of Appeals said, " * * * and the minutes of the days doings of the body, being signed by the clerk thereof, there is a subscription of the note or memorandum made by the party, by its agent duly authorized. This is a satisfactory compliance with the statute. It meets the purpose and intention of the law, by providing an enduring and unchanging evidence of the agreement; and it meets its letter, for there is some note or memorandum of it in writing subscribed by the party to be charged thereby, the subscription made by an authorized agent." This case was cited with approval by Judge William C. Hecht, Jr. in the case of Douchkess v. Campbell, Sup., 64 N.Y. S.2d 554.

The Statute of Frauds, therefore, is not a valid defense.

■ As to the defense of lack of consideration, attention is directed to the case of Mandel v. Liebman, 303 N.Y. 88, at page 93, 100 N.E.2d 149, at page 152, wherein the Court said, "It is commonplace, of course, that adult persons, suffering from no disabilities, have complete freedom of contract and that the courts will not inquire into the adequacy of the consideration." It continued, 303 N.Y. at pages 93 and 94, 100 N.E.2d at page 152, "Despite the general rule, courts sometimes look to the adequacy of the consideration in order to determine whether the bargain provided for is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible according to its literal terms. (See 1 Corbin on Contracts, § 128, p. 400.) It has been suggested that an unconscionable contract is one 'such as no man in his senses and not under a delusion would make on the one hand, and as no honest or fair man would accept on the other.' See Greer v. Tweed, 13 Abb.Pr.,N.S., 427, 429; Hume v. United States, 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393; Baxter v. Wales, 12 Mass. 365, 366. The inequality, Chancellor Kent said, 'must be so strong and manifest as to shock the conscience and confound the judgment of any man of common sense.' Osgood v. Franklin, supra, 2 Johns.Ch. [1] at page 23."

The agreement herein was made after considerable deliberation by members of the Board of Directors. At least one member of the Committee which negoti-

ated with the plaintiff, Mr. Patterson, was a lawyer, and a member of the firm which was general counsel of the defendant. He must have been satisfied that there was adequate consideration for the action of the Board of Directors, since it was he who offered the resolution in question when the Board of Directors reconvened at 2:00 P.M. on August 23, 1954, which resolution, incidentally, was unanimously adopted.

 I also reject the defense that the plaintiff forfeited his rights under the contract by his refusal to assign his interest in the patent application to the defendant. The resolution contains no provision which justifies such a conclusion. From all the evidence it appears that the agreement made with the plaintiff on August 23, 1954, whether it was for severance of his employment or for the retention of his services as a consultant, was entered into completely independently of the patent application. The record is barren of any discussion involving that matter during the negotiations, and there is no basis for the belief that the defendant's obligation under the agreement of August 23, 1954 was conditional on the transfer of plaintiff's interest in the patent application.

Therefore, I find for the plaintiff in the sum of $39,930.56.

 I come now to the defendant's counterclaim for a judgment directing the plaintiff to assign to it his interest in the patent application and for money damages for his failure to do so. Judge Learned Hand, in the case of E. F. Drew & Co. v. Reinhard, 2 Cir., 170 F.2d 679, at page 682, set forth the test to be applied in a situation such as obtains here when he said, "Nor need the contract (to assign inventions) be expressed any more than any other contract; as the restatement of agency well puts it: 'For the employer to be entitled to a patent it is not necessary that the contract should specifically so provide.' *It 'is a question to be decided upon all the facts of the individual case.' In short, such a contract may be implied from the relations of the parties."* (Matter in parentheses added.) (Emphasis supplied.)

The plaintiff had no written contract with the defendant when he was employed as President. The question then is: Do the facts incident to his selection as President warrant the implication that the defendant is entitled to the plaintiff's interest in the patent application? To answer that question consideration must be given to the condition of the shaving instrument division of the defendant and the position of the plaintiff prior to his selection as President. The defendant's patent on its injector razor had expired; because of their poor quality its business in razor blades had declined sharply. What was the plaintiff's business background? Although not a professional engineer, he had been Vice President in charge of engineering for one of America's largest industrial organizations, American Can Company. As such, he had set up various plants throughout the country, including a plant for the manufacture of torpedoes during World War II. All of these facts were known to the Directors of the defendant, and especially to Mr. Tunney, a member of the Board, who testified that he was one of the persons instrumental in inducing the Board of Directors to elect the plaintiff President. He received an annual salary of $49,999 for his services as President. He testified that after his election he instituted a program which resulted in an improvement in the quality of the blades. Without cost to himself he used the facilities and personnel of the defendant to develop the new injector razor. The plaintiff's contribution to the actual construction of the model of the new injector razor appears to have consisted chiefly of his suggestion to Kuhnl, an experienced inventor, that two pins be inserted in the blade, causing it to float when the razor head was opened. He bore none of the cost of the experiments, nor did he pay any part of the legal expenses incident to the preparation and filing of the application for the pat-

ent. All of those expenses were borne by the defendant. After the development, by Kuhnl, of the working model, the plaintiff, as President of the defendant, asked for and obtained authority from the Board of Directors to expend the sum of $550,000 to tool up for production, the ultimate cost of which, as hereinbefore mentioned, was about $650,000. He knew, also, that the defendant was expending large sums of money to advertise and promote the new razor, to which the defendant had given the name "Hydro-Magic".

The annual report to stockholders for the year ending February 28, 1954, received as defendant's Exhibit "O", includes a letter from the President, (the plaintiff) bearing his signature, and containing the following statement:

"On March 1, 1954, the company introduced *its* new Hydro-Magic Razor and the new Hydro-Magic gold toned blades— the first important change since the original patents on the injector razor. This product is expected to contribute substantially to future earnings." (Emphasis added.)

The letter then refers to various aspects of company operations on the following pages of the report, among which is the following:

"At the end of February, *we* released to the trade the most important development of the past year—the amazing new Eversharp Hydro-Magic Razor. This razor went into the creative stage two years ago. At that time *our research organization was enlarged and staffed with the best know-how available*—and a comprehensive development plan went into effect. Through research, we determined what men actually wanted in a razor. With this valuable background material *our inventors* were able to develop the new Eversharp Hydro-Magic Razor. *A sizeable amount of money was invested in tools, dies and equipment. New production facilities were established to produce this new razor.*" (emphasis added). There then follows a description of the

razor. Neither the letter nor the report contains any statement which would indicate that the plaintiff claims any interest in the invention or that the same is not wholly the property of the defendant. As a matter of fact, both the letter and the report indicate the contrary.

From all the facts and circumstances in the case, and the relationship of the parties, it is my opinion that it was implicit in the contract of employment of the plaintiff that his services as President would include such service as constituted his contribution to the development of the new injector razor which is the subject matter of the counterclaim herein. See E. F. Drew & Co. v. Reinhard, supra; Dowse v. Federal Rubber Co., D. C., 254 F. 308.

Accordingly, judgment is rendered in favor of the defendant on its counterclaim, directing the plaintiff to transfer to it his interest in patent application No. 425618, filed in April, 1954; the defendant's demand for money damages is denied.

Submit proposed findings of fact and conclusions of law in conformity herewith.