**GREAT LAKES PRESS CORPORATION,**
Plaintiff,

v.

**Thomas W. FROOM, Defendant and Third–Party Plaintiff,**

v.

**TDI ACQUISITION CORP., the Case–Hoyt Corporation, and Rendoll Paper Corporation, Third–Party Defendants.**

No. CIV–86–233T.

United States District Court,
W.D. New York.

Dec. 18, 1987.

Kenneth A. Payment, Harter, Secrest & Emery, Rochester, N.Y., for plaintiff and third-party defendants.

Glenn E. Pezzulo of Counsel, Culley, Marks, Corbett, Tannenbaum, Reifsteck & Potter, Rochester, N.Y. and William G. Todd, Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, for defendant.

## DECISION AND ORDER

TELESCA, District Judge.

Plaintiff filed this action seeking a declaratory judgment that it is not infringing United States Patent No. 4,555,027 (" '027") or Patent No. 4,699,614 (" '614") and that said patents are invalid because, *inter alia*, they were obvious, 35 U.S.C. Section 103, defendant was not the sole inventor, 35 U.S.C. Section 116, and defendant failed to make the required disclosures, 35 U.S.C. Section 112. Plaintiff also asserts three state law causes of action; seeking a declaration of shop rights, for unfair competition based on the defendants' refusal to assign the patent to the plaintiff, and from misappropriation of trade secrets.

Defendant, Thomas W. Froom, counterclaimed alleging that the plaintiff is infringing the '027 patent. Defendant has also asserted four state law counter-claims; for breach of contract, for unjust enrich-

ment, for fraud, and for the sum of Seventeen Thousand Five Hundred Dollars, ($17,-500.00) allegedly due to the defendant from a profit sharing/pension plan. Plaintiff has moved for partial summary judgment as to its third and fourth causes of action, for unfair competition and misappropriation of trade secrets, and seeks an Order requiring the defendant to assign the '027 patent and the '614 patent to the plaintiff. Plaintiff further moves for summary judgment dismissing counts two, three and four of the defendants' counter-claim; breach of contract, unjust enrichment, and fraud.

## BACKGROUND

Great Lakes Press, the plaintiff, is the successor in interest to the Rendoll Paper Company. Great Lakes Press is a Rochester, New York based printing company owned for many years by the Lovenheim family. In 1962 the Lovenheims founded Rendoll Paper Corporation with Jack Hutchinson, a person with previous experience in the folding carton industry. Hutchinson was the President of Rendoll and ran the day-to-day operations. Rendoll, which had been formed in part as an outlet for Great Lakes Press' printing services, began to concentrate its sales in the market for half gallon rectangular folded containers which hold ice cream.

In 1970 Hutchinson hired the defendant, Thomas W. Froom, as Vice–President for Sales at Rendoll at the salary of Twenty-eight Thousand Dollars, ($28,000.00) per year. Froom had worked for twenty years at the Brown Company in Kalamazoo, Michigan as Marketing Manager of their parafin carton division. Hutchinson knew Froom through various trade association meetings.

The parties are in dispute as to how much of the growth in Rendoll's sales from the period 1970 through 1975 is attributable to Froom's work as Vice–President for Sales. More importantly, the parties vigorously dispute the extent to which Rendoll employees other than Froom participated in discussions and work towards the development of a new, patentable folding container for ice cream. Plaintiff contends that over a period of years the question of developing a new carton design was a general topic of discussion among the Rendoll management staff at their daily luncheon meetings. Hutchinson's affidavit indicates that he hired Raynor Holmes as an outside consultant to develop prototype cartons and that a Rendoll employee named Edward Beiderbeck prepared the carton drawings which became the basis for the patent application.

Froom contends that he brought to Rendoll the idea of producing a patentable carton and that he alone had the expertise necessary to carry out that task. He claims to be the sole inventor of the "Tuck-tite" technology.

The significance of having a patented carton blank is that the ice cream manufacturer which adopts the use of the particular carton design can only purchase the blanks from authorized manufacturers. Further, the ice cream manufacturer must also purchase machinery designed specifically for folding and filling the particular type of carton. The patent holder of a carton typically receives royalties from the manufacturer of the folding and filling machine.

On January 1, 1976 Jack Hutchinson stepped aside as President of Rendoll to become Chairman of the Board and Froom was promoted to President. At that time, Froom entered into an employment contract with Rendoll for the first time. The contract contained a stock option and stock purchase plan which allowed Froom to purchase up to ten percent (10%) of Rendoll's common stock. The contract only gives a general description of Froom's duties: "Froom agrees to perform such duties and discharge such responsibilities as the Board of Directors of the Company may from time-to-time determine, consistent with the position of President." The contract is silent as to any responsibilities for the development of inventions and patents or the assignment of same to the Company.

In early 1976 Rendoll and Froom took a number of steps towards patenting what had become known as the "tuck-tite" carton. On Froom's recommendation Rendoll hired Gordon Hueschen to defend the tuck-

tite technology against a claim that it was infringing U.S. Patent No. 3,040,957 ("the Myers patent").

In May of 1977 Froom, as President of Rendoll, entered into a contract with Anderson Brothers Manufacturing Company for the development of a folding and filling machine to go along with the tuck-tite carton. Rendoll was to share in the development costs of the machine and to be paid a royalty payment for each machine sold.

In the fall of 1977 Patent Attorney Gordon Heuschen was again hired, this time to develop a patent application for the tuck-tite technology. Heuschen completed the patent application, which listed Froom as the sole inventor, and an assignment of the patent to Rendoll. Froom executed the application papers and the assignment, the latter being notarized by another Rendoll employee. The application papers and the assignment were then forwarded to Heuschen. Heuschen filed the application on October 17, 1977 but, as per Froom's instructions, Heuschen held the assignment for one month, until November 17, 1977, when it was then filed at the Patent Office.

Froom contends that during this one month period he had a conversation with Clifford Lovenheim in which Lovenheim promised Froom he would be "well taken care of and never want financially" if he agreed to assign the patents to Rendoll. Plaintiff contends that such a conversation never occurred, but for purposes of this motion, is willing to agree that Lovenheim made the statement.

The tuck-tite application eventually led to the issuance of four United States patents: 4,239,115; 4,328,656; 4,431,129; and 4,526,-563 ("tuck-tite I—IV").

Froom's counter-claims for fraud, unjust enrichment, and breach of contract are based on Rendoll's alleged violation of the agreement to provide Froom with further compensation in return for the assignment of the tuck-tite I—IV patents. Plaintiff contends, that as a matter of law, Froom as President of Rendoll, was obliged to assign the tuck-tite patents to Rendoll without any further compensation. Froom has ac-

knowledged that Rendoll paid the patent prosecution costs and development costs of the tuck-tite I–IV patents.

The tuck-tite cartons were not commercially viable because they had leakage problems. The parties again disagree as to whether only Thomas Froom or several Rendoll employees were involved in the process, taking several years, during which the leakage problem in the tuck-tite technology was solved. In September of 1983 Froom again hired Gordon Heuschen to process the patent application for this improvement in the tuck-tite technology. Although the development costs of the new invention were paid for by Rendoll, Froom hired Heuschen personally, without Rendoll's knowledge, to prepare the patent application. During the same time period Heuschen was still working as Rendoll's patent attorney continuing the prosecution of the four original tuck-tite patents and their foreign patent counterparts. Although Heuschen mailed drafts of the new patent application and assignment to Froom as President of Rendoll, at Rendoll's address, his bill for the work in processing the '027 application was sent to Froom, individually, at his home address. Thus it was without Rendoll's knowledge that Heuschen filed the application, on September 19, 1983, which eventually led to the issuance of the '027 patent. Froom also executed and had notarized the assignment of the '027 patent application to Rendoll. Froom forwarded the assignment to Heuschen but informed him not to file the assignment. In April of 1985, when Froom was still President of Rendoll, he retrieved the assignment from Heuschen and retains it to this day.

Plaintiff contends, that as a matter of law, Froom is obliged to assign the '027 patent to Rendoll. Froom's first counter-claim alleges that the plaintiff is infringing the '027 patent.

By 1984, his last full-year of employment at Rendoll, Froom's salary had been increased to One Hundred Thousand Dollars, ($100,000.00) a year, plus a Thirty Thousand Dollar, ($30,000.00) bonus, a car and a Twenty-five Thousand Dollar, ($25,000.00)

expense account. In addition, Froom had hired his son, James, and daughter, Victoria, to work for Rendoll. In this same year Froom entered into discussions with the Lovenheims regarding the possibility of purchasing Rendoll from them. Froom continued in his efforts to make improvements in the tuck-tite technology during his last year at Rendoll.

In early 1985, Froom was informed that the Lovenheims were about to enter into a deal to sell all of their businesses, Great Lakes Press, Rendoll Paper and others, to Case–Hoyt (a third-party defendant). In early May of 1985 Froom was terminated as President of Rendoll after the Lovenheims revealed to him that no additional compensation would be provided to him as part of the sale of the tuck-tite technology to Case–Hoyt, nor was any employment contract for Froom contemplated as part of the deal with Case–Hoyt.

On May 22, 1985, just a few days after Froom's discharge from Rendoll, Heuschen filed a third patent application for further improvement in the tuck-tite technology. The patent specifically states that it is an improvement on the '027 patent. Like the '027 patent, the application was filed without Rendoll's knowledge and the assignment of the patent to Rendoll was not filed. Subsequent to the institution of this litigation the patent office issued the '614 patent to Thomas Froom based on the May, 1985 application. As part of their motion, plaintiff seeks to have this Court declare that it is the owner of the '614 patent and to order the defendant to assign that patent to it.

The parties have made repeated reference to two other documents concerning the employment relationship between Froom and Rendoll. The first is the provision in Froom's employment contract which provides for a one year covenant not to compete if Froom is discharged and a two year covenant if he voluntarily quits. The second is a group of work rules issued by Rendoll during the time of Froom's employment which calls for all employees to assign all inventions and patents to Rendoll. For purposes of this motion, plaintiff does not rely on either of these documents, the validity of which Froom vigorously contests.

## DISCUSSION

Rule 56 of the Federal Rules of Civil Procedure provides for the granting of summary judgment when the moving party has "shown that there is no genuine issue as to any material fact and that ... [they are] ... entitled to judgment as a matter of law." The moving party bears the burden of initially showing that there are no genuine disputes as to material facts in the case. *Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party has come forward with such a showing, the burden then shifts to the opposing party to establish that there are material facts in dispute. *Matsushita Electric Industrial Company v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"Summary judgment will not lie if the dispute about a material fact is 'genuine', that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The evidence proferred and the inferences drawn therefrom must be viewed in the light most favorable to the party opposing summary judgment. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Beyah v. Coughlin*, 789 F.2d 986, 989 (2d Cir.1986).

In this particular case, the plaintiff has, for purposes of this motion, conceded four disputed areas which, should this case go to trial it reserves the right to argue. For the purposes of this motion only the plaintiff concedes the following: that the defendant Thomas W. Froom was the only Rendoll employee involved in the inventions incorporated in the tuck-tite I–IV, '027 and '614 patents; that Clifford Lovenheim gave an oral assurance to Froom that he would be "well taken care of and never want financially" if he would assign the patents to Rendoll; that the covenant not to compete contained in Froom's employ-

ment contract is not enforceable; that the work rule requiring assignment of patents to Rendoll issued during the terms of Froom's employment with Rendoll are not applicable to the dispute over these particular patents. Plaintiff argues that with these factual disputes conceded on its part there remains no material fact in dispute and it is entitled to judgment as a matter of law.

Plaintiff's legal argument is that Froom, as the President and Chief Executive Officer of Rendoll, had a legal obligation to assign all inventions and patents to Rendoll even if there was no employment contract requiring such assignments. The plaintiff further argues that if such a legal duty is established defendants' counter-claims for breach of contract, unjust enrichment and fraud must of necessity fall; there being no consideration for a contract, there being no unjust enrichment if the patents belong to Rendoll and there being no possibility of justifiable reliance, a necessary element of fraud, if Froom was obliged by law to assign the patents.

■ Defendant contends that there are numerous material facts which are in dispute which require this Court to deny the motion for summary judgment. As can be expected in a complex litigation involving relationships between parties that extended over 15 years there are numerous facts which are in dispute, but whether these are material to the outcome of the case is determined by the substantive law governing the issues. *Anderson v. Liberty Lobby, Inc., supra* 106 S.Ct. at 2510. In this case the law governing the central dispute, whether Froom had a legal duty to assign the patents to Rendoll, is governed by state law concerning the ownership of patents in the employment context. *E.F. Drew & Company, Inc. v. Reinhard,* 170 F.2d 679 (2d Cir.1948).

In addition to the state common law there has developed a substantial body of "federal common law" with regard to the question of ownership of patents in the employment context. This body of "federal common law" has developed as the result of the fact that federal courts have *exclusive* jurisdiction over claims for patent infringement (such as defendants' first counter-claim) and declaratory judgment actions on patent validity (such as plaintiff's first cause of action), 28 U.S.C. Section 1338(a), as well as having *original* jurisdiction over related unfair competition claims (normally a state law cause of action) pursuant to 28 U.S.C. Section 1338(b).

■ New York State law and "federal common law" are in agreement on the general principle that no duty on the part of a "general" employee to assign inventions made during the course of employment arises from the employment relationship, absent an employment contract to that effect.

> If an employee is hired to invent or is given the task of devoting his efforts to a particular problem, the resulting invention is the employers, and any patent obtained by the employee must be assigned to the other.... On the other hand, an employee whose employment is "general" is entitled to retain any patent which he procures and need not assign it to his employer, even though his employment "cover a field of labor and effort in the performance of which the employee conceived the invention for which he obtained a patent" ... Indeed, even where an employee is hired to "devote his time and services to devising and making improvements in articles ... manufactured" in his place of employment, he is entitled to enjoy the fruits of any invention which he conceives while so employed and is under no duty to turn the patent obtained over to the employer "in the absence of an express agreement to that effect."

*Cahill v. Regan,* 5 N.Y.2d 292, 296–297, 184 N.Y.S.2d 348, 157 N.E.2d 505 (1959) (citations omitted).

> One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained. The reason is that he has only produced that which he was employed to invent. His invention is the precise subject of the contract of employment. A term of the

agreement necessarily is that what he is paid to produce belongs to his paymaster.... On the other hand, if the employment be general, albeit it cover a field of labor and effort in the performance of which the employee conceived the invention for which he obtained a patent, the contract is not so broadly construed as to require an assignment of the patent.

United States v. Dubilier Condenser Corporation, 289 U.S. 178, 187, 53 S.Ct. 554, 557, 77 L.Ed. 1114 (1933).

Froom argues that he was clearly not hired to invent but rather as Vice-President of Sales and was later promoted to President with a wide variety of duties. Thus he argues that as a "general employee", and absent any employment contract provision requiring assignment, the law is clear that he had no duty to assign the patent in question to Rendoll.

Plaintiff does not contest the general statement of law articulated in Cahill v. Regan, supra, and U.S. v. Dubilier, supra, but argues that they do not cover the situation where the employee is the President, Chief Executive Officer, and a Director of the corporation. Plaintiff relies upon a variety of cases from various jurisdictions which hold that when the employee/inventor is the President of the corporation and "ran the plaintiff's business in every respect", Mechanical Plastics Corp. v. Thaw, 197 U.S.P.Q. 651, 652 (S.Ct. Nassau County 1977), that he owes a duty to assign all inventions and patents under one of several theories: (1) that as an officer of the corporation Froom had a fiduciary duty to act in Rendoll's interest and not deprive it of any "corporate opportunity", North Branch Products, Inc. v. Fisher, 131 U.S. P.Q. 135, 137 (D.C.D.C.1961); Grip Nut Company v. Sharp, 150 F.2d 192, 197 (7th Cir.1945); Mechanical Plastics Corp. v. Thaw, supra, at 654; (2) that the President was the "alter ego" of the corporation, Dowse v. Federal Rubber Company, 254 Fed. 308 (N.D.Ill.1918); or (3) that he led the corporation to believe that the patent was a corporate asset, Oliver v. Lockport Mills, 6 Misc.2d 356, 362, 163 N.Y.S.2d 317 (S.Ct. Niagara County 1956); Preis v. Ever-

sharp Inc., 154 F.Supp. 98, 102–103, 114 U.S.P.Q. 324 (E.D.N.Y.1957). In response the defendant has attempted to distinguish the facts of the case at bar from the facts in the various cases relied upon by the plaintiff and to present other cases which he contends stands for the proposition that no special obligation to assign patents or inventions arises by virtue of Froom having been the President and Chief Executive Officer of the corporation. Burden v. Burden Iron Company, 39 Misc. 559, 80 N.Y.S. 390 (S.Ct. Rensselear County 1903); Cornell v. T.V. Development Corp., 41 Misc.2d 628, 245 N.Y.S.2d 918 (S.Ct.Nassau County 1964). As one court noted:

> The principles governing the rights of the employee and the employer to an invention made in the course of employment are well settled but their application to specific factual situations has given rise to much litigation ...

Oliver v. Lockport Mills, supra 6 Misc.2d at 361, 163 N.Y.S.2d 317 (citation omitted.)

In Mechanical Plastics Corp. v. Thaw, supra, the defendant, Thaw was hired as the president of the plaintiff corporation and was given a one year written employment contract which included a provision requiring him to assign all patents and inventions to the corporation. The employment contract was for one year. Although Thaw's employment as the president was continued for several years and he eventually became a stockholder, a director and chief executive officer of the corporation, the written employment contract with the assignment clause was never renewed. Both parties sought to rely on Cahill v. Reagan, supra; plaintiff alleging that although Thaw had not been "hired to invent" he was "given the task of devoting his efforts to a particular problem," while Thaw contended that his employment was "general" and thus no duty to assign arose. Although the Court also held that the terms of the employment contract should be deemed to remain in effect as long as Thaw remained an employee of the company, before reaching that conclusion it stated the following

The Court cannot quarrel with the general statement made in *Cahill.* ... it is doubtful that Thaw was either hired to invent or comes within the definition of one who is employed specifically to the task to devoting his efforts to a particular problem. Thaw was employed to run the business of Mechanical Plastics, and not to devote himself to a particular phase of the business. On the other hand, Thaw cannot be considered a mere employee, he was the President of the corporation. He was its chief operating officer, a director, and stockholder and was in complete control of all its operations. In fact, he was, for all practical purposes, the corporation. He owed the corporation an undivided loyalty. He had no right to take advantage of this position of trust and power to obtain property rights which would conflict with his clear duty to his company (*Foley v. D'Agostino*, 21 A.D.2d 60 [248 N.Y.S.2d 121]).

*Mechanical Plastics Corp. v. Thaw, supra* at 654.

Similar statements of this fiduciary duty or duty of loyalty owed by the President and Chief Executive Officer of a corporation are made in the other cases relied upon by plaintiff: ("By reason of the defendant's status and position as principal shareholder, officer, director and general manager ... defendant was in a fiduciary relationship with the plaintiff at the time the inventions claimed in the patents were developed ...") *North Branch Products, Inc. v. Fisher, supra*, at 137 (Upon entering into the employ of plaintiff, there rested upon Sharp the duty of fidelity to his employer's interest and of acting for the furtherance and advancement of the business in which he was engaged, and not to its injury.) *Grip Nut Company v. Sharp, supra*, at

197 ("He did not expressly contract as a part of his duties to design new tires; but if he did so agree in substance, and was more than a mere employee, having the main responsibility to make the business successful, then he should be compelled to assign the patent.") *Dowse v. Federal Rubber Company, supra*, at 310.

It is true, as defendant points out, that in the *Mechanical Plastics Corp.* case, the Court stated as an alternate basis for its holding that the assignment terms of the earlier, unrenewed employment contract remained in effect. In the *Grip Nut* case, however, although there had also been an unrenewed employment contract which had an assignment clause, the Court made it determination purely on the basis of the "duty of fidelity to his employer's interest" that resulted from the defendant's position as President and General Manager of the company. *Grip Nut Company v. Sharp, supra* at 197.

In the instant case, after he was elevated to the position of President, Froom had overall control of "the entire operation instead of just making sales." (Plaintiff's Exhibit 1 Deposition of Thomas W. Froom, p. 80.) Froom was responsible for production, hiring and firing of all employees, settling union grievances, negotiating union contracts, and the patent program at Rendoll. (*Id.* at pp. 80–83 and p. 188.) Froom made all day-to-day decisions at Rendoll with the exception of decisions to make capital investment in new plant equipment, which were taken to the entire Board of Directors.[1] As President and Chief Executive Officer, Froom clearly falls within the description of those types of employees who owe a fiduciary duty to the corporation as indicated by *Mechanical*

---

1. Deposition of Thomas W. Froom taken January 19, 1987, questions by Joseph W. Berenato, III, Esq. beginning at pg. 80:

Q. You became President of Rendoll on January 1, 1976, correct?
A. Well, I think it was before that but I don't—slightly. Our fiscal year ended October 1st, and that is probably correct.

Q. How did your responsibilities of the corporation differ when you became President than when you were Vice President?
A. Well, I was responsible for production, directly. I was responsible for the whole operation instead of just making sales.
Q. Were you, I guess, pretty much in day-to-day control of Rendoll when you became President?
A. Yes.

*Plastics Corp.* and the other cases cited *supra.*

The cases which defendant relies upon for the proposition that no such duty exists, do not support his position. In *Burden v. Burden Iron Company, supra,* a stockholder sought to set aside a royalty agreement which called for the corporation to pay royalties to its president in return for the assignment of patent rights on the basis, *inter alia,* that nothing was given in consideration for the agreement because the president had a legal duty to assign. Although the Court found no legal duty to assign, and therefore held the contract valid, it did not reach the question of whether a president of a corporation owes a fiduciary duty to assign inventions and patents because the president/inventor received no salary from the corporation and, therefore, was not an employee. *Burden v. Burden Iron Company, supra* 39 Misc. at 569, 80 N.Y.S. 390. In addition, it appears that the president/inventor was not the corporate officer who made the day-to-day decisions regarding how the company was run. *Id.* at 566, 80 N.Y.S. 390. So too, in *Cornell v. T.V. Development Corp., supra,* relied on by the defendant, the inventor/employee was not the president of the company and the Court did not address the question of the fiduciary duty of a controlling corporate officer.

In addition to his overall control of the corporation, it is clear that Froom led Rendoll to believe that the tuck-tite I–IV patents and the '027 patents were Rendoll's property. Froom entered into a contract as President of Rendoll with Anderson Brothers for development of a machine to fold and fill the tuck-tite cartons. This contract was entered into on behalf of Rendoll several months before the alleged conversation between the defendant and Clifford Lovenheim wherein assurances of financial remuneration were made. With regard to the '027 patent, Froom had the patent application and an assignment of his interest in the patent sent to him at Rendoll as President of Rendoll. He had another Rendoll employee notarize his signature after he executed the assignment. There can be no doubt that he led the corporation to

believe that the work done on tuck-tite and the further developments of the ice cream carton "was being done for the company and that the result of the research would belong to the company." *Oliver v. Lockport Mills, supra* 6 Misc.2d at 362, 163 N.Y.S.2d 317; *Preis v. Eversharp, Inc., supra.*

Finally, as to the question of whether Froom owed a duty to assign the patents, defendants contends that the existence of an employment contract which is silent as to the question of assignment of patents and inventions, defines the limits of any duties and obligations which he owed to Rendoll and bars this Court from reading such a duty into the employment relationship. The caselaw does not support defendant's argument. Quoting from the Restatement of Agency, Section 397, Judge Learned Hand stated in *E.F. Drew and Company v. Reinhard, supra,*

> For the employer to be entitled to a patent, it is not necessary that the contract should specifically so provide. It is "a question to be decided upon all the facts of the individual case." In short, such a contract may be implied from the relations of the parties.

*E.F. Drew & Co. v. Reinhard, supra* at 682.

For these reasons I conclude that as President of Rendoll, defendant had a legal duty to assign to Rendoll patents and inventions. Therefore, defendant is ordered to assign all right title and interest to the '027 and '614 patents to Rendoll Paper or its successor in interest, and to file those assignments in the United States Patent Office. The facts as they are developed thus far, however, do not provide a basis for this Court to conclude that Froom is currently engaged in misappropriation of trade secrets and accordingly plaintiff's motion for summary judgment as to its fourth cause of action is denied. Having established that plaintiff owns the exclusive rights to the '027 patent, it follows that defendant's counterclaim for patent infringement must fail. Although it is not clear that plaintiff moved for summary judgment dismissing defendants first coun-

ter-claim, for infringement, this Court will dismiss that claim *sua sponte* based on the declaration, *supra*, that plaintiff is exclusive owner of the patents.[2]

■ Having declared that the defendant owed a legal duty to assign the patents to the plaintiff, it follows that plaintiff cannot have been guilty of breach of the alleged oral contract entered into when Clifford Lovenheim gave his assurances to Froom. Froom having had a pre-existing legal duty to assign the patents, he could give no good consideration in return for a promise of future remunerations. *Vanderbilt v. Schreyer*, 91 N.Y. 392, 401 (1883). Similarly, as to the defendant's third counterclaim, for unjust enrichment, Froom cannot show that any enrichment as a result of the use of the tuck-tite patents was at his expense given his duty to assign those patents to Rendoll. *Miller v. Schloss*, 218 N.Y. 400, 113 N.E. 337 (1916), *Chase Manhattan Bank v. Banque Intra S.A.*, 274 F.Supp. 496, 499 (S.D.N.Y.1967). Accordingly, plaintiff's motion for summary judgment dismissing the defendant's second and third counterclaims, for breach of contract and unjust enrichment, is granted.

■ Defendant's fourth counterclaim is for fraud based on the allegedly false representations made by Clifford Lovenheim. As with the defendant's other counterclaims, the declaration that he had a legal duty to assign the patents forecloses his asserting an essential element of a cause of action for fraud, namely reliance. *Dopp v. Franklin National Bank*, 461 F.2d 873, 880 n. 16 (2d Cir.1972). *See also, Williston*, Contracts Section 1515 at 477 (3d Edition 1970).

## CONCLUSION

Based on the foregoing findings, plaintiff's motion for summary judgment as to its third cause of action, for unfair competition, is granted. The defendant Thomas W. Froom is ordered to execute an assignment of all right, title and interest of U.S. Patent No. 4,555,027 and Patent No. 4,699,614 to the plaintiff Great Lakes Press. The defendant Thomas W. Froom is further ordered to file said assignments with the United States Patent Office.

Plaintiff's motion for summary judgment on its fourth cause of action, for misappropriation of trade secrets, is denied.

Plaintiff's motion for summary judgment dismissing the defendant's first cause of action, for patent infringement is granted. Plaintiff's motion for summary judgment dismissing the defendant's second cause of action, for breach of oral contract, is granted. Plaintiff's motion for summary judgment dismissing defendant's third counterclaim, for unjust enrichment, is granted. Plaintiff's motion for summary judgment dismissing defendant's fourth counterclaim, for fraud, is granted.

For purposes of clarity it is useful to review what remains of the complaint and counter-claim. Plaintiff asserted four causes of action; seeking a declaratory judgment of patent invalidity, seeking a declaration of shop rights, for unfair com-

---

2. Plaintiff originally filed this motion on May 15, 1987 seeking summary judgment on its third and fourth causes of action, summary judgment dismissing all five of defendants' counterclaims, and injunctive relief. Oral argument was heard on the motion on July 21, 1987 and all motions were denied at that time. The parties were directed to conduct further deposition and the plaintiff was instructed that it was free to renew the motions after depositions had been conducted.

The renewed motion was filed on November 18, 1987 but the request for preliminary injunction was not included in the renewed motion and the counter-claims which the plaintiff sought to have dismissed were listed only as claims two, three and four (for breach of contract, unjust enrichment, and fraud).

It is clear that neither party had addressed defendants' counter-claim number five, for Seventeen Thousand Five Hundred Dollars, ($17,500.00) due from the pension/profit sharing plan, either in May when the motion was first made nor in November in the renewal motion. Counter-claim number one, however, by which defendant alleges that the plaintiff is infringing the '027 and '614 patents can only be brought if the defendant is the owner of rights in those patents. Having just declared that defendant must assign all right, title and interest in those patents to the plaintiff it follows *a fortiori* that defendant cannot maintain a counter claim for infringement.

petition, and for misappropriation of trade secrets. By this Order summary judgment is granted in favor of the plaintiff as to its third cause of action. Plaintiff's motion for summary judgment as to its fourth cause of action is denied.

Defendant asserted five counter-claims, the first four of which are dismissed by this Decision and Order. Defendants sole remaining counter-claim is for Seventeen Thousand Five Hundred Dollars, ($17,500.00) alleged due and owing from the profit sharing/pension plan.

This Decision and Order does not address Froom's third-party complaint which, for now, remains intact.

ALL OF THE ABOVE IS SO ORDERED.